**UNITED STATES of America**

v.

**Guillermo Novo SAMPOL, Appellant.**

**UNITED STATES of America**

v.

**Alvin Ross DIAZ, Appellant.**

**UNITED STATES of America**

v.

**Ignacio Novo SAMPOL, Appellant.**

**Nos. 79–1541, 79–1542 and 79–1808.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 10, 1980.

Decided Sept. 15, 1980.

Rehearing Denied Dec. 9, 1980.

---

Michael Young, New York City, for appellants in cases 79–1541 & 79–1542.

Ellen S. Shapiro, with whom Michael Geltner, Washington, D. C., was on brief, for appellant in case 79–1808.

Dianne H. Kelly, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell, E. Lawrence Barcella, Jr., Asst. U. S. Attys., Washington, D. C., were on brief in cases 79–1541, 79–1542 & 79–1808 for appellee.

Before MacKINNON and ROBB, Circuit Judges and CORCORAN,* United States District Judge for the District of Columbia.

Opinion PER CURIAM.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

PER CURIAM **:

On September 21, 1976, in Washington, D.C., Orlando Letelier, former Chilean Ambassador to the United States, and Ronni Moffitt, an American associate, were mortally wounded by the remote control detonation of a bomb attached to the undercarriage of the automobile in which they were riding.

On August 1, 1978, Guillermo Novo Sampol (Guillermo Novo), Alvin Ross Diaz (Ross), Juan Manuel Contreras Sepulveda (Contreras), Pedro Espinoza Bravo (Espinoza), Armando Fernandez Larios (Fernandez), Jose Dionisio Suarez Esquivel (Suarez), and Virgilio Paz Romero (Paz) were indicted. The seven were charged in Count 1 with conspiracy to murder a foreign official, 18 U.S.C. § 1117; in Count 2, with murder of a foreign official, 18 U.S.C. §§ 1111, 1116; in Count 3, with first–degree murder of Letelier, 22 D.C.Code § 2401; in Count 4, with first–degree murder of Moffitt, 22 D.C.Code § 2401; and in Count 5, with murder by use of explosives to blow up a vehicle engaged in interstate commerce, 18 U.S.C. § 844(i). Guillermo Novo was also charged with two counts (6 and 7) of false declarations to the grand jury in violation of 18 U.S.C. § 1623. His brother, appellant Ignacio Novo Sampol (Ignacio Novo), was charged with two counts (8 and 9) of false declarations to the grand jury, 18 U.S.C.

§ 1623, and in Count 10 with misprision of a felony, 18 U.S.C. § 4.

Trial by jury commenced January 8, 1979 on the charges against Guillermo Novo, Alvin Ross and Ignacio Novo only.[1] At the close of trial on February 14, 1979 each was found guilty of all charges lodged against him.[2] This appeal followed.

The evidence produced at trial was voluminous, but a brief summary shall suffice at the outset. The principal witness for the prosecution was Michael Vernon Townley (Townley), who admitted his complicity in the killings and struck a plea bargain with the government in return for his testimony.[3] Townley, a United States citizen, entered the employ of DINA, the intelligence agency of the Chilean government in 1974. In the course of that employment, according to Townley, he was designated to carry out the murder of Letelier, who had served in the government of Salvadore Allende before Allende was ousted in 1973. Townley enlisted the help of the Cuban Nationalist Movement (CNM), an anti–Castro organization with which each appellant was affiliated. The thrust of the government's case was that officials in Chile plotted to murder Letelier in order to crush his outspoken opposition to the Chilean government. In order to isolate themselves as far as possible from any attack on Letelier, DINA officials ordered Townley to secure assistance from the CNM.

---

** The opinion in this case is issued *per curiam* not because it has received less than full consideration by the court but because the number and complexity of the issues raised on appeal, and the need for expediting the decision, made it advisable to share the effort required to draft this opinion among the members of the division.

1. At that time Contreras, Espinoza, and Fernandez were awaiting the results of extradition proceedings in Chile, and Suarez and Paz were fugitives.

2. Guillermo Novo and Ross were sentenced to concurrent life sentences on Counts 1, 2, 3 and 5 and to a consecutive life sentence on Count 4. Guillermo Novo was also sentenced to five years on each of his two false declaration counts, the sentences to run concurrently with each other and with the life sentences imposed on Counts 1, 2, 3 and 5. The judgment and commitment on Count 3 was vacated for both

Guillermo Novo and Ross. Ignacio Novo received a sentence of five years on each of his two false declaration charges, to run concurrently with each other, and three years on the misprision count to run consecutively to the five year sentences.

3. The essential terms of the bargain were: (1) Townley would plead guilty to one count of conspiracy to murder a foreign official, 18 U.S.C. § 1117; (2) any additional charges against Townley in connection with the Letelier case would be dropped; (3) Townley would not testify as to other crimes committed outside the jurisdiction of the United States; (4) the government would agree, subject to judicial approval, to imposition of a sentence of ten years, with parole eligibility after three years and four months; and (5) the United States would provide for the safety and protection of Townley and his family.

The primary theory of the defense was that appellants were simply not involved in the murder of Letelier. Appellants also sought to prove that Townley was in fact an agent of the United States Central Intelligence Agency (CIA) which had planned the assassination of Letelier and accordingly, no motive for the murder could be attributed to DINA or to the members of CNM.

During the trial major evidence of the guilt of Guillermo and Ross was introduced by the prosecution in the form of testimony from government informants who were inmates of the same cell blocks with Guillermo and Ross. These informants were operating in cooperation with the government. Following the conclusion of the trial, in the case of *U. S. v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115, decided on June 16, 1980 the Supreme Court ruled that such testimony is inadmissible. We are thus required to reverse the convictions of Guillermo and Ross and remand the cases for retrial without the benefit of such evidence.

Also, for failure to grant a separate trial we reverse the convictions of Ignacio Novo Sampol. There was a substantial disparity between the lesser offenses he was charged with and those that directly involved the murders and conspiracy, and we point out additional deficiencies in charges against him and the sentences.

Appellants have made numerous allegations of error. We discuss these allegations below, providing additional factual background where appropriate, and consider all major issues and those we consider likely to recur at the retrial.

## I

## THE TESTIMONY OF THE INFORMANTS KAMINSKY AND POLYTARIDES

In his testimony before the jury Townley gave a detailed account of the planning and execution of the murder of Letelier. A government witness, Sherman Kaminsky, testified to admissions made to him by the defendant Ross. Another witness, Antonio

Polytarides, testified to an incriminating statement made to him by Guillermo Novo, in the presence of Ross. The testimony of these two informants corroborated in part the testimony of Townley. The incriminating statements had been made to the informants while they and the defendants were fellow prisoners at the Metropolitan Correctional Center, the federal detention center in New York City. The defendants objected to the admission of the informants testimony on the basis of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). After lengthy hearings on voir dire the court admitted the evidence. On this appeal the defendants renew their objection, citing *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

Townley testified that in 1976 he was an agent of the National Directorate of Intelligence, known as DINA, the intelligence and secret police agency of the government of Chile. The director of the agency was Juan Manuel Contreras Sepulveda. In the summer of 1976, said Townley, he was assigned by DINA to go to the United States and arrange for the murder of Orlando Letelier. He was told to get in touch with members of the Cuban Nationalist Movement, a Cuban exile group based in the United States, and ask them to carry out the mission for DINA. Pursuant to instructions he came to the United States on September 9, 1976 and met with leaders of the CNM, including the defendant Guillermo Novo.

On the night of September 10, said Townley, several members of the CNM met with him in his hotel room in New Jersey. Present were Guillermo Novo, Alvin Ross, Virgilio Paz, Jose Suarez and other members of the CNM. According to Townley, Guillermo Novo and Paz said that Chile and the CNM shared a common political ideology, and the Cubans wanted help from Chile, such as recognition of a government in exile, sanctuary for fugitives, and participation in training programs.

The Cubans did not respond that night to Townley's request for assistance. The next day Guillermo Novo told Townley that the

CNM would cooperate in the murder, but they insisted that Townley personally take part in the operation. Accordingly, Townley, Paz and Suarez came to Washington where they put together an explosive device, and at midnight on September 18 Townley taped this bomb to the cross member under the driver's seat of Letelier's car. The bomb was exploded by remote control on September 21, 1976, at Sheridan Circle in Washington. Letelier and Ronni Moffitt, a passenger in the car, were killed.

## A. THE TESTIMONY OF KAMINSKY

Sherman Kaminsky testified before the jury that he met Alvin Ross at the Metropolitan Correctional Center in New York in late May or early June 1978. Kaminsky was there pending sentence on indictments charging interstate racketeering and extortion. He and Ross were confined in the same unit and at some time after June 14, 1978 they "began to talk to each other". Ross had heard that Kaminsky had been a member of Hagannah, an arm of the Israeli military, and he said the Cuban Nationalist Movement aspired to having a similar organization. In many conversations after that Ross and Kaminsky talked about politics and the government of Chile. Ross said the interests of Chile and the Cuban Nationalist Movement were the same, that they were both anti–Castro and anti–Communist, and Chile could supply the Cuban Nationalist Movement with money, safe territory, an exchange of agents for instruction, and weapons and explosives.

According to Kaminsky Ross "told me that he was involved in the murder of Orlando Letelier together with generals in DINA, Sepulveda, Michael Townley, and other members of the Cuban National [sic] Movement in this country." Ross referred to Townley as a traitor, a rat, an informer. He told Kaminsky that he had attended a meeting at which Townley, an agent of DINA, said DINA and General Contreras wanted a Marxist agent assassinated, that this agent was a threat to DINA and that the cooperation of the Cuban Nationalist Movement in the murder would help to cement relations and agreements between the Movement and DINA. Ross called Letelier a rotten Communist Marxist and said he was glad Letelier was dead, that he had contributed two wires used in the bomb that killed him.

Ross also expressed anger because DINA had not given him some money which he had expected. He predicted that he would not pay for Letelier's murder because the CIA would be the scapegoat, people would believe anything of the CIA. He wrote the address and telephone number of his brother Al Ross in Miami Beach, Florida, on a piece of paper and gave it to Kaminsky. A xerox copy of this paper was received in evidence as Government Exhibit 126. (Tr. 4380)

As we have said, Kaminsky and Polytarides were examined at length on voir dire. In addition, before Kaminsky was permitted to testify before the jury, his counsel, William I. Aronwald, Esquire, of the New York bar, made a statement for the record which all parties accepted as evidence. (Tr. 3677 et seq.; 3696; 3698; 4278) The voir dire hearings, together with cross examination before the jury, revealed the circumstances which led to the appearance of Kaminsky and Polytarides as informants. We turn now to that evidence with respect to Kaminsky.

Sherman Kaminsky had been indicted for extortion and interstate racketeering in the Southern District of New York, in the District of New Jersey, and in the Northern District of Illinois. After pleading guilty to each indictment he became a fugitive and remained a fugitive for twelve years until January 1978, when he was arrested in Tacoma, Washington. He was then returned to the Southern District of New York and held at the Metropolitan Correctional Center in New York City. While there he began to get information from other prisoners which he would relate to Mr. Aronwald, and Mr. Aronwald in turn would pass to the United States Attorney for the Southern District of New York. Prior to June 14, 1978 Kaminsky provided information concerning a threat to the life of a federal

judge and a threat to the life of an undercover police officer. He also gave information indicating that an inmate in the Danbury Correctional Institution planned to escape. This information was passed along to the United States Attorneys for the Southern and Eastern Districts of New York and to the FBI.

On June 14, 1978 Kaminsky appeared for sentencing before Judge Irving Ben Cooper in the United States District Court for the Southern District of New York. Present in addition to the defendant were his counsel, Mr. Aronwald, and John Bartels, Esquire, and Assistant United States Attorney Shwartz, the prosecutor in the Kaminsky case in the Southern District. The proceedings were held in the robing room, the court noting that this was done because of the defendant's "cooperation with the authorities"; and the court directed that the minutes be sealed.

At the outset of the sentencing proceedings Mr. Shwartz invited the court's attention to Kaminsky's cooperation with the authorities in New York, which he said was continuing, and Mr. Aronwald noted that within the past three weeks Kaminsky had given information concerning a planned escape from Danbury. The court then addressed the defendant, saying in part as follows:

THE COURT (Sentencing TR. 9–11): I want you to listen very carefully to what I have to say.

\* \* \* \* \* \*

In the first place, I think it necessary for me to tell you who the judge is who is to sentence you. And why? Because I want to point out to you that I have been around, and I want to point out to you that I am not falling for anything; that whatever I do I am going to do in such a way that if you in any way disappoint me, I will put the clutch on you so that no matter what you do you won't be able to extricate yourself from the judge's sentence.

I know it sounds threatening, but I have got to talk plain. (Sentencing TR. 9)

\* \* \* \* \* \*

Your lawyers have done one whale of a job for you, Mister. They believe in you. I don't. That is putting it on the line. I'm not sure of you; they are.

Why do I bother with you altogether, then? Why don't I just throw the book at you and say you did a dirty, slimy, almost inhuman bit of deportment, you should pay, and I wish the law would enable me to multiply it by ten? Why do I bother with you altogether since I suspect you?

For the simple reason that there has been called to my attention by your lawyers and by the Government, in all fairness, that you have been cooperating. Does that mean that I am convinced that you have told everything you know? Not by a hell of a long way. No, sir. You haven't convinced me of that. I don't know whether you are peddling some of this a bit at a time. (TR. 10–11)

See, I have had people like you. Some of them were my witnesses before I became a judge. I have seen some of the worst rogues rise to the top, and I have seen some of the worst rogues go down the gutter. What they do by way of saying they will cooperate is to dole it out like with a medicine dropper.

I think I was able to tell which ones were really opening up and which ones were really playing a game of cat–and–mouse.

I have a feeling that you are in the middle ground, that you are giving some material, and I think some valuable material, but I think you can go much further.

Do I think Kaminsky would not succumb to the temptation of going back to the same kind of maneuvering that he engaged in? I'd like to think not, but I may say candidly that when you are in a corner I think you may very well pull off the old kind of stuff. (TR. 11)

\* \* \* \* \* \*

I come back to the only thing that makes me talk to you, spend my energy, exercise a sore throat.

Why do I do it? I say I do it only because I believe you can be cooperative with the authorities to the end that the community will be benefited by the help that you are in a position to give. (TR. 12, 13)

THE DEFENDANT: I can and I will, your Honor.

THE COURT:

\* \* \* \* \* \*

And your lawyers are in pleading with me to give you a chance to make good and not put you in jail. Why am I considering doing it? Only because you may be of service to the national community. If I didn't think that you could render service and be helpful, and in that way possibly purge yourself, I wouldn't spend three minutes with you, ... (TR. 16)

\* \* \* \* \* \*

All of which makes me reiterate that I'm not sold on you. (TR. 18)

\* \* \* \* \* \*

I ask you very plainly: If I give you a chance to cooperate with the authorities, I don't care where the authorities are in America, in the United States of America—I don't care whether it's Alaska or whether it's New Jersey or Chicago—Hammock did it, and you know I clipped his sentence because he did it. But he proved it, and only after he proved it did I cut the sentence.

I ask you plainly. Don't kid yourself. Get this over with, Kaminsky. If there is nothing here for you, don't fool yourself. I will find out. Take your sentence. Have it over with. Don't bluff the judge.

When the judge says to you "Kaminsky, do you think you can help the authorities?", don't brush me off or think you are satisfying me by saying yes. Don't say yes unless you know what you are talking about, because I will find out. (TR. 18, 19)

Now, what do you say?

Kaminsky responded (TR. 19, 20):

THE DEFENDANT: Judge Cooper, I have been listening to every word you said. I believe every word you say.

Your reputation goes before you. You are considered a hard judge, and I believe everything that you just said.

And, in answer to your question, if the Government will enable me to help, if they will allow me to help, I will purge myself. I am limited in how I can help. I can do more; I have offered to do more. There isn't enough that I can do to satisfy what I have done. But I will give the Government my full and total cooperation if they will just let me, if they will just give me an opportunity to really go and do the things that I know I can do. This is the opportunity I need. (TR. 19)

\* \* \* \* \* \*

I can really give them service, really do things. I want to be able to do things. I told this to both my attorneys a long time ago.

I was born and raised in the streets of New York. I served time in jails in New York. I know a lot of people that are in crime and they are people that know me, and they are people that have always thought that "this is one of our kind."

I don't know how to describe it. But there are people that have confidence in me, they talk to me, and I could utilize these confidences if they would let me, and I have done the best that I could under the circumstances.

Judge Cooper, I haven't held anything back. I haven't held one thing back. As quickly as it came to me, that is as quickly as I called Bill Aronwald.

But I give you my word that the U.S. Government in any capacity has got my full and total cooperation. But to please give me an opportunity to let me use it, to let me show them.

The court replied:

All right. That is fair enough. (TR. 19, 20)

Turning to Mr. Shwartz the court then repeated that the purpose of the sentence he was about to pronounce was "to hold [the defendant] to account, on his pledge to be of service to the authorities." (TR. 20) The court asked him (TR. 21).

Am I to infer that you see the wisdom of taking, urging such steps on the part of the authorities as will enable this defendant to make good what he pledges he is prepared to do.

Mr. Shwartz replied (TR. 22) that his office and the authorities in the Eastern District had told the United States Attorney in the Northern District of Illinois about Kaminsky's cooperation and "the ongoing nature of Mr. Kaminsky's assistance." He said the federal prosecutor in the Eastern District was "hopeful of securing Mr. Kaminsky's testimony in some capacity", and that "Any cooperation in terms of other new fields which I think we all hope may turn out to be fruitful, I don't think that the U.S. Attorney's Office for this district can do anything to enable Mr. Kaminsky to do that." He concluded (TR. 23): "I think all that your Honor can fairly expect of Mr. Kaminsky–and all Mr. Kaminsky offers–is that he cooperate to the fullest extent he can under the circumstances he finds himself in."

Expressing satisfaction with these representations the court noted (TR. 23):

The Government can only go as far as it possibly can under these circumstances. I think it would be foolhardy not to alert everyone as to what you have said on the record, Mr. Kaminsky, and if I find that you have nevertheless done all you can while in confinement ... I certainly am not going to hold it against you so long as I am convinced that, while in confinement, you went all out ... all of which leads me to say very candidly that I will give this defendant credit for whatever he does, even if he comes up with almost nothing. But if he has actually tried and I am impressed that he has tried, I will give him credit for that. But he's got to strain himself, ... (TR. 25) I am going to give you a chance to prove yourself. I intend to hand you a sentence and I am going to suspend the operation of that sentence depending on how you come through, and you know what I mean by that expression ... You are going to be on probation. You are going to have to prove to the judge that you really are what you say you are, that you really will

perform what you pledge will be performed, that you recognize that is the only reason why the judge is allowing this kind of a sentence to come into existence.... (TR. 28, 29) If you don't make good, I will throw you in the can if it's the last act I do before I pass on.... The point is, Mr. Kaminsky, I've just got to go back to the first utterance I made: You are suspect; that's it. You might as well know. You surprise me by showing me you are what you are, I will back you up to the hilt. And, if you don't I will back you into jail. (TR. 31)

Kaminsky responded:

Judge Cooper, number one, I believe you. God knows, I believe every word that you are saying.

I will try my hardest.

This afternoon, this evening, visiting me at the Detention Center here is Mr. Gambino's cousin. He is coming to visit me. I have explained this to Mr. Aronwald. I explained it to Mr. Bartels.

There is no limitation to what I can do or what I can attempt to do, but I know I can accomplish something. Your Honor, please believe me.

I want to be able to purge myself. I don't know if it's possible, but I want the chance.

The court repeated (TR. 33) that

one of the main conditions of probation is your unstinted, unlimited, full cooperation with all the authorities, federal and state, anywhere in the United States of America.

The court sentenced Kaminsky to imprisonment for five years and a $10,000 fine, the term of imprisonment to be suspended, and the defendant was placed on probation for five years. Sentence in the New Jersey case, which had been transferred to Judge Cooper, was continued for six months to December 14, 1978. The court noted (TR. 35):

I don't know what I am going to do at the end of six months. I am going to measure, see how far he goes.

Concluding the proceedings the court said (TR. 37):

The judgment and commitment will be sealed. I just don't want any leak. I don't want anybody to hurt you. I don't want any of that. I don't want you endangering yourself; understand that.

I expect the Government to give you protective custody if protective custody is required. But that doesn't say that you can relax and say "nuts to them" unless they do this, that and the other. You have got to show 100–percent good faith. You have got to forge ahead on your own.

Kaminsky replied (TR. 37):

I will, your Honor. Judge Cooper, I will never lie to you, nor will you ever get a report that is a lie from me. I will do my hardest and I want to thank you for giving me a chance.

After his sentencing on June 14, 1978 Kaminsky continued in confinement at the Metropolitan Correctional Center. He and Ross were on the same floor, along with some sixty other men. Before Kaminsky was sentenced, however, he had not talked to Ross or given any information about Ross. (TR. 4382, 4475, 4476, 4491, 3679) Kaminsky testified that "one day Mr. Ross initiated a conversation with me. We'd seen each other prior to that, but there had been no conversation." For this first conversation Ross took Kaminsky to his room where they talked about the Cuban Nationalist Movement, the Hagannah, and the desire of the CNM to create a military organization similar to the Hagannah. Thereafter, said Kaminsky, they had many conversations. Kaminsky testified (TR. 3808):

I never initiated any conversation with Mr. Ross, but there is no need to initiate a conversation with Mr. Ross. Mr. Ross will talk and talk and talk as long as you are able to listen. There were times when I literally had to run to get away from him, because I was working at the institution and had a job. For some reason Mr. Ross decided that he wanted to talk to me, and he talked continuously . . .

In August 1978 Ross told Kaminsky that he had plans to take motor boats, load them with explosives and by use of remote control blow up Russian ships in American harbors. He also talked about attempts he had made on the life of Fidel Castro. Kaminsky made notes of this conversation and reported it by telephone to his attorney Mr. Aronwald. He asked Mr. Aronwald to turn the information over to the CIA. According to Kaminsky he did this because he thought Ross was "a dangerous man." On or about August 11 he gave Mr. Aronwald the five or six pages of notes he had made. Mr. Aronwald called Assistant United States Attorney Shwartz on the telephone, gave him the substance of the notes, and made an appointment to meet with him on August 17. At that meeting Mr. Aronwald turned the notes over to Mr. Shwartz with the understanding that Shwartz would make an effort to find out who Ross was, whether he was a defendant and whether the information contained in the notes was helpful or relevant to any case in which the government was interested.

Early in October Kaminsky was taken to the office of Mr. Shwartz to discuss the information he had given concerning threats on the lives of a police officer and a federal judge. Mr. Aronwald was present at the meeting. At that time the information Kaminsky had given concerning Ross was also discussed, and Mr. Aronwald and Mr. Shwartz told Kaminsky that they wanted no questions or information concerning Ross' defense and "above all, do not initiate any conversations with Mr. Ross."

On October 17 Kaminsky gave Mr. Aronwald additional information concerning Ross and the Letelier murder which Mr. Aronwald in turn related to Mr. Shwartz. Mr. Shwartz said he would pass the information along to Mr. Propper, the prosecutor in the Letelier case, and as soon as they could agree on how and to what extent the information could be used, Mr. Shwartz would be in touch with Mr. Aronwald to schedule a meeting. Thereafter the meeting was scheduled for October 31. On that day Mr. Aronwald and Kaminsky met with Mr. Propper and Mr. Shwartz in Shwartz's office. Mr. Propper repeated the admoni-

tion previously given by Mr. Aronwald and Mr. Shwartz, that Kaminsky was not to initiate any conversations with Ross or report any information concerning his defense. Mr. Propper also told Kaminsky the nature of the charge against Ross and mentioned the names of four or five codefendants. It was agreed that for Kaminsky's protection, to avoid the "security problems" that might arise "if they were constantly transporting him back and forth to the United States Attorney's Office", Mr. Aronwald would be the only person having any contact with him and that Kaminsky would give Mr. Aronwald what information he had, to be passed on to the United States Attorney. To avoid any intrusion on defense strategy discussions Mr. Aronwald agreed to screen the information before passing it on.

After August 1978 Kaminsky continued to make notes on his conversations with Ross and to relay information through Mr. Aronwald. The record contains sets of his longhand notes dated respectively September 1978, December 2, 1978, December 14, 1978 and January 17, 1979.

On December 19, 1978 Kaminsky appeared before Judge Cooper in the Southern District of New York, for sentencing on the case transferred to the Southern District from the District of New Jersey.[4] At this proceeding, held in the robing room, Assistant United States Attorney Shwartz gave the court his assessment of Kaminsky's performance as an informant between the time of sentencing on June 14 and December 19. He informed the court that in the "period of time since [June 14, 1978 Kaminsky] has in fact fulfilled your Honor's predictions." Specifically, Mr. Shwartz referred at some length to the value of the information which Kaminsky had secured from Ross, and which had been related to Mr. Propper. He reported that Mr. Propper "has spoken in glowing terms of the value of Mr. Kaminsky's information." In response to a question from the court Mr. Shwartz stated that Kaminsky had also fur-

nished information concerning the "possibility" of action against a cooperating witness in a mail fraud case. Mr. Aronwald also noted (TR. 13, 14):

> During the six months that has elapsed since your Honor had previously sentenced Mr. Kaminsky back on June 14, Mr. Kaminsky has continued to be incarcerated at the Metropolitan Correction Center. It is fair to say that one of the reasons that we did not come before your Honor and request that bail be set with respect to the New Jersey case was because of several factors, one of which was that in view of the Chicago detainer, any bail considerations would have been academic, but moreover Mr. Kaminsky's true value to the government, his ability to be able to demonstrate his good faith and his cooperation, seem to be enhanced, strangely enough, by his continued incarceration.

After hearing from Mr. Aronwald the court concluded: "Mr. Kaminsky, you have come through. I am satisfied ..." The court then imposed sentence on the New Jersey indictment of five years imprisonment, suspended, and probation for a period of five years, to run concurrently with the five–year period of probation previously imposed in the New York case.

▮ On January 8, 1979 the case against Ross, Guillermo Novo and Ignacio Novo came on for trial in the United States District Court for the District of Columbia. In due course Kaminsky took the stand as a government witness, after the government had agreed to recommend to the court in the Northern District of Illinois that he be sentenced to the time he had already served with probation to be granted. The defendants objected to the introduction of his testimony on the ground that under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), it would violate Ross' Sixth Amendment right to counsel. The court ruled however that Kaminsky would be permitted to testify about conversations with Ross which occurred prior to his Octo-

---

**4.** A transcript of this proceeding was transmitted to this court by the district judge as part of the record on appeal, along with the transcript of the sentencing proceeding of June 14, 1978.

ber 31 discussion with Mr. Propper, the prosecutor in this case. We hold that this ruling was error, that the testimony of Kaminsky should not have been admitted. That testimony was so damaging to Ross that his conviction must be reversed.

We think this case is controlled by *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In that case the Supreme Court held that statements made to an informant by the defendant Henry should not have been admitted at trial. It appeared that Henry had been indicted for armed robbery of a bank and had been confined in a local jail pending trial. One Nichols was then serving a sentence on local forgery charges and he and Henry were in the same cell block. Nichols had been for some time a paid informant of the Federal Bureau of Investigation. Learning that Henry and Nichols were housed in the same cell block, along with other federal prisoners awaiting trial, an FBI agent told Nichols not to initiate any conversation with or question Henry regarding the bank robbery, but to be alert to any statements made by any federal prisoner. After Nichols was released from jail he told the agent that he and Henry had engaged in conversation and that Henry had made incriminating admissions about the bank robbery. Nichols was paid for furnishing this information. At trial Nichols testified that he had "an opportunity to have conversations with Mr. Henry while he was in the jail", and that Henry had described to him the details of the robbery and made other damaging admissions. The Supreme Court held that Henry's statements to the informant should not have been received in evidence. The Court rejected the government's characterization of Henry's incriminating statements as "voluntary and not the result of any affirmative conduct on the part of government agents to elicit evidence." The Court said:

> The question here is whether under the facts of this case, a government agent "deliberately elicited" incriminating statements from Henry within the meaning of *Massiah*. Three factors are important. First, Nichols was acting under

instructions as a paid informant for the government; second Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.

> The Court of Appeals viewed the record as showing that Nichols deliberately used his position to secure incriminating information from Henry when counsel was not present and held that conduct attributable to the government. Nichols had been a paid government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion. The arrangement between Nichols and the agent was on a contingent fee basis; Nichols was to be paid only if he produced useful information. This combination of circumstances is sufficient to support the Court of Appeals' determination. Even if the agent's statement is accepted that he did not intend that Nichols would take affirmative steps to secure incriminating information, he must have known that such propinquity likely would lead to that result.

(Pps. 270, 271, 100 S.Ct. pp. 2186–87) [footnote omitted]

At trial and again in their opening brief in this court the defendants relied heavily on the decision of the Fourth Circuit Court of Appeals in the *Henry* case, 590 F.2d 544 (4th Cir. 1978), which held that the testimony of the informant Nichols was inadmissible. The government on the other hand urged the District Court and us to follow *Wilson v. Henderson*, 584 F.2d 1185 (2d Cir. 1978), which upheld the admissibility of statements made in circumstances which the government averred were "virtually identical" with those existing in the *Henry* case. *Wilson v. Henderson*, said the government, employed "the better reasoning". Now that the Supreme Court has affirmed the decision of the Fourth Circuit, however, the government argues that the present case is "completely distinguishable

**638**

from *Henry.*" (Supp.Br. for Govt., p. 3) We do not perceive the distinction.

Although Kaminsky was not to be compensated with money on a contingent fee basis, his freedom on probation was contingent upon his "coming through" as an informer, that is, it depended on the quality and extent of his "cooperation". "Cooperation" meant "unstinted, unlimited full cooperation with all the authorities, federal and state, anywhere in the United States of America." It required that Kaminsky not "dole" out information "with a medicine dropper", but "strain himself", "forge ahead on [his] own", and "go all out." Kaminsky gave his "pledge" to act as an informer on those terms. He did "come through" and was rewarded by a grant of his freedom, a commodity more precious than money.

It is true, as the government points out, that when Kaminsky undertook his informing project on June 14, Mr. Shwartz was interested in his information about threats to a federal judge and a police officer, and was unaware of his association with Ross. The conversations with Ross however did not begin until later and when they did begin, and Kaminsky made his first report about them in August, Mr. Shwartz displayed a lively interest. From that time until early January Kaminsky continued to report to Mr. Shwartz through Mr. Aronwald. It is immaterial that the reports went to Mr. Shwartz and not to Mr. Propper, the prosecutor in the Letelier case. Mr. Shwartz and Mr. Propper were both agents of the Department of Justice, the prosecuting agency of the government. In any event, no matter when Mr. Shwartz heard of Ross or became interested in Kaminsky's information concerning him, it is clear that on June 14, 1978 Kaminsky was accepted by the government as an informant at large whose reports about any criminal activity would be gratefully received. As a competent federal prosecutor Mr. Shwartz was of course interested in obtaining any information that would assist the government in prosecuting a criminal case. And so, beginning on June 14 the government trolled in the jail, using Kaminsky as bait, and was ready to net any unwary inmate who rose to the lure.

Kaminsky's ability to "ingratiate" himself with criminals was part of his stock in trade. As he put it at the sentencing proceedings on June 14, 1978

I know a lot of people that are in crime and they are people that know me, and they are people that have always thought that "this is one of our kind". I don't know how to describe it. But there are people that have confidence in me, they talk to me . . .

He did ingratiate himself with Ross, so much so that Ross gave him the name, address and telephone number of Ross' brother in Miami, so that Kaminsky could communicate with the brother.

The government argues that Judge Cooper could not "transform a defendant into a government agent for *Massiah* purposes by the imposition of conditions of probation dictated entirely by the judge". (Supp.Br., p. 3) The short answer to this contention is that no one suggests that the judge made Kaminsky an agent. Kaminsky was an active and eager informer when he appeared for sentence on June 14. He had already informed about threats to a judge and a police officer. His acceptance of the conditions laid down by Judge Cooper merely confirmed him in the status of informer, and pledged him to "go all out" and "forge ahead on [his] own" in pursuit of the reward posted by the judge with the approval of the government. After June 14 his goal was to obtain and report incriminating admissions from Ross, a fellow inmate who trusted him. His testimony about those admissions should not have been admitted.

### B. THE IMPACT OF KAMINSKY'S TESTIMONY ON GUILLERMO NOVO

■ The government argues that even if Kaminsky's testimony was prohibited by the *Henry* decision the conviction of Guillermo Novo is unaffected. We do not agree.

Kaminsky testified (TR. 4350):

Mr. Ross told me that he was involved in the murder of Orlando Letelier together with generals in DINA, Sepulveda, Michael Townley, and other members of the Cuban National [sic] Movement in this country.

Counsel for Guillermo Novo immediately moved for a mistrial upon the ground that "Guillermo Novo has been identified as the ideological leader of the Cuban Nationalist Movement" so that the quoted statement by Ross necessarily implicated him. The court denied the motion for a mistrial, saying he would give a "curative instruction" and he thereupon told the jury (TR. 4353):

Ladies and gentlemen of the jury, I instruct you that this witness' testimony only relates to the conversations he had with the Defendant Alvin Ross. It does not cover any relationship with the Defendant Guillermo Novo or Ignacio Novo, and the testimony that he gives is to be considered only in that light and not with relation to the other defendants.

At the conclusion of Kaminsky's testimony the court told the jury (TR. 4499):

Now, again, you are instructed that the testimony of Mr. Kaminsky falls outside of the time alleged in the indictment relative to the conspiracy and also his statements, his testimony refers only to the defendant Ross and not to the defendants Guillermo Novo and Ignacio Novo.

We think these instructions were inadequate to protect Guillermo Novo from the damaging effect of Kaminsky's testimony. The instructions did not tell the jury in plain terms that it must not consider the admissions of Ross to which Kaminsky testified as evidence against any other defendant. The proper instruction, modeled on the standard jury instruction, would have been:

The testimony of the witness Kaminsky is evidence only against the defendant Ross. It is not evidence against any other defendant and you must not consider it in any way in determining the guilt or innocence of any other defendant.

*See* Standard Jury Instructions, 2.48, 2.53.

The prejudice to Guillermo Novo resulting from Kaminsky's testimony was accentuated by the prosecutor in his argument to the jury. Thus, referring to the meeting between Townley, Guillermo Novo, and the other Cubans in Townley's hotel room before the murder the prosecutor treated Kaminsky's testimony as substantive direct evidence about the meeting. He said (TR. 5161–62):

Guillermo Novo is upset about Rolando Otero and he tells Michael Townley and the rest of the Cubans at that meeting, tells Michael Townley and they tell him, they will get back to him later.

*But it isn't Michael Townley alone who testifies about that meeting. Ladies and gentlemen, remember Sherman Kaminsky, the gentleman that was at the Metropolitan Correction Center with Alvin Ross, who talked about how Alvin Ross talked all the time, and what did he say?*

He said that Ross told him that he attended a meeting and it was a meeting with this traitor, this rat, Townley–called him a traitor and a rat–you know, he never called him a liar, he called him a trator [sic] and a rat, and he said he told Kaminsky that at this meeting Townley said that General Contreras, the head of DINA, wanted the Marxist assassinated, who was a threat to DINA, that it would help cement relations between DINA and the CNM.

He called him a rat, traitor, an informant, but never a liar.

*Sherman Kaminsky, ladies and gentlemen, wasn't at that meeting, but he knew from Alvin Ross, from what Alvin Ross told him what went on and he told you. He told you very much like Michael Townley told you what went on at that meeting.*

*You heard the testimony that the next day, ladies and gentlemen, Guillermo Novo, Jose Dionisio Suarez tells Townley, "All right. [sic] we'll do it."*

[Emphasis supplied]

Aside from these specific examples of prejudice to Guillermo Novo flowing from Kaminsky's testimony, that evidence in general furnished strong corroboration for

the testimony of Townley, the principal witness for the government. Without Townley's testimony the government would not have had a case. By corroborating Townley Kaminsky necessarily damaged Guillermo Novo.[5]

The conviction of Guillermo Novo must be reversed.

## C. THE TESTIMONY OF POLYTARIDES

■ Antonio Polytarides was also a prisoner at the Metropolitan Correctional Center while Ross and the defendant Guillermo Novo were there. Before the jury Polytarides testified that he had been convicted of illegal diversion of firearms in 1977 and in December 1977 had been brought to the Center from Sandstone, Minnesota, on a writ. The purpose of the transfer was to allow him to assist Customs Agent King in King's investigation of other persons involved in Polytarides' case. He testified that he met Guillermo Novo late in May or early in June 1978 and probably had more than ten conversations with him after that. On or about December 19, 1978 he said, he saw Novo "and he seemed to me very nervous, aggravated, something was bothering him and I asked him, 'What is wrong, Guillermo?' and then he turned around and he says, 'Well, I have been betrayed by some persons in my case, but we will pay them back.'" Ross was present during that conversation. He did not say anything but was "nodding his head".

On voir dire Polytarides testified that in December 1977 he was brought to the Metropolitan Correctional Center so that he could furnish information to agents of the United States Customs Service about the people he was dealing with in his business of selling arms and munitions. The Customs Service also wanted to know if he had any information about other similar cases. He talked to Special Agent King of the Customs Service about these matters. He testified further that beginning in January 1978 certain prisoners at the Center approached him about the purchase of weapons. Among these people was a Cuban, Louis Sotomeyer, who was interested in purchasing ten machine guns, five for his group and five for another Cuban group. Sotomeyer indicated the other group was the one responsible for the Letelier bombing.

Around March 1978 Sotomeyer introduced Polytarides to an inmate named Joseph Battle who was also interested in purchasing machine guns. By this time the original purpose of Polytarides' transfer to the Metropolitan Correctional Center had been satisfied and he wanted to be returned to Sandstone. When he told Agent King about the approaches to buy machine guns however King told him to "try and see really what they" want; (TR. 3939) and he and King decided that he would furnish information to King about the sale of machine guns, and see if he could "arrange for some of these purchases." (TR. 3952)

Around the end of May or beginning of June Sotomeyer, who was leaving for a parole hearing, turned the machine gun transactions over to Joseph Battle. Battle introduced Polytarides to Guillermo Novo as "the person for the other group that was interested to purchase machine guns." (TR. 3941) Polytarides told Novo "I know who you are because Mr. Sotomeyer and Battle told me your group is the one that arranged it, arranged the Letelier bombing." According to Polytarides Novo responded, "Yes, our group is responsible for that." (TR. 3941) Polytarides reported this conversation to Agent King, although King had not asked him to find out anything about the Letelier bombing, and he understood that he was remaining at the Metropolitan Correctional Center for the purpose of arranging the machine gun deals.

---

**5.** The significance of Kaminsky's testimony was indicated within two hours after the jurors began their deliberations, when they requested: "All Government agreements with witnesses." (TR. 5583, 5585, 5586) In response Government agreements with Kaminsky, Canete and Townley were delivered. (TR. 5588, Exhibits 34, 112, 112a and 127)

Polytarides reported to King on a regular basis, usually over the public telephone from the Correctional Center, and on two occasions personally. One of the personal meetings took place in the presence of an Assistant United States Attorney, in his office in the Eastern District of New York. (TR. 3952) Polytarides would tell King what was going on and sometimes King would give him directions as to what he should do in a particular situation. (TR. 3955) This went on for several months. At one time Guillermo Novo told Polytarides that two members of his group were fugitives. When Polytarides reported this conversation Mr. King instructed him "to try to find out about the two fugitives." Pursuant to this instruction he told Novo he could arrange safe passage for the two on a Greek tanker. Novo did not respond immediately but five minutes later "he came back and says, they are not interested." (TR. 3944) This was around the middle of July and thereafter Novo did not talk freely to Polytarides; they merely greeted each other, without any conversation.

On November 9, 1978 Polytarides was notified by the Parole Board that he would be paroled January 17, 1979. Late in November or early in December Novo asked him what his parole situation was. When Polytarides replied that he would be granted parole Novo said he was very happy and thereafter he started talking to Polytarides again. He then expressed an interest in purchasing 160 machine guns and large quantities of explosives and grenades. One day he appeared to be very angry and when Polytarides asked why he was angry he said "they had been betrayed by certain people in his case but I will pay them back." (TR. 3947–48) Ross was with him at that time but did not say anything, just nodded his head. (TR. 4179)

Polytarides testified that Agent King did not promise him anything but said he would make his cooperation known to the Parole Board. He insisted that he was giving King information only because he thought it was "the correct thing to do". (TR. 3964–66) Polytarides was placed on parole January 17, 1979.

The District Court at first rejected the proffered testimony of Polytarides. In this ruling the court said (TR. 4136):

As I view and perceive the matter, the defendant Guillermo Novo was put upon and sought out by the witness. The nature of the question and the conversation ... show that the witness knew ... of the Chilean bombing, as you have admitted, before speaking to Novo. And he exploited the situation.

While he did not have any contact with any of the law enforcement personnel or the FBI working on this case, he did have contact with the Customs Bureau official. There is nothing to show that there was any relationship between the Customs official and the FBI. There is testimony from the witness, however, that he was given consideration for an earlier parole, which he received.... I am left with the strong feeling, as I watched and heard, ... that this witness, as I view everything that he said, both on direct and cross, that he set out to secure information in a positive way, he stayed on in his role as an informer. He was fortified with knowledge at a point in time that Novo, one of the persons involved in the Letelier bombing, was in the jail with him facing charges.

Upon reconsideration the court ruled that the testimony of Polytarides concerning Novo's complaint in November or December, that he had been betrayed, would be admitted. The court said (TR. 4200):

I find that the witness' testimony shows that while the relationship had broken off back in July or June, it was resumed and resurrected again, not by his own initiative.

While he is relaying to Agent King or the Customs Officer King the results of the conversation, those conversations only relate to the question of arms transactions.

Guillermo Novo, according to what I have before me, is the person who resurrected the broken–off relationship.

We hold that the District Court's original ruling was correct; the testimony of Polytarides should have been excluded in its entirety. Without repeating our discussion of *United States v. Henry*, it is enough to say that the reasoning of the Supreme Court in that case requires our conclusion.

The District Court correctly found as facts that Polytarides was an informant retained by Agent King and that in this capacity he set out to secure information from Guillermo Novo. However we do not agree with the District Court's later conclusion that because Novo's relationship with Polytarides was "broken off" and then "resurrected" by Novo on his own initiative the conversation of November or December was admissible. In November and December Polytarides was still an informant, taking advantage of Novo's trust and confidence. We also reject the government's contention that Polytarides' testimony was admissible because "his only function as informant was to follow through with weapons negotiations initiated by other inmates". (Govt. Supp.Br. p. 11) The theory that Polytarides was a specialist informant is belied by the facts. Finally, we are not impressed by the government's argument that after receiving his parole date Polytarides had no expectation of further benefits from the government, or need for them. True, he had been informed that he would be paroled in January but he was still in jail and still in a position to benefit from the favorable opinions and kind words of government authorities; and he would remain in that position while on parole.

**6.** 18 U.S.C. § 1623.

**7.** The crime of misprision involves the concealment of a felony from the prosecuting authorities by one not guilty of the crime.

> 18 U.S.C. § 4 provides:
> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.
> June 25, 1948, c. 645, 62 Stat. 684.

The misprision count charged:

The admission of the testimony of Polytarides was prejudicial error affecting both Guillermo Novo and Ross. We cannot say that it was harmless beyond a reasonable doubt, as the government suggests.

## II

### THE CONVICTIONS OF IGNACIO NOVO FOR FALSE DECLARATIONS AND MISPRISION

#### A. THE MOTION FOR SEVERANCE OF IGNACIO NOVO

■ Ignacio Novo was indicted on two counts of making false statements to a grand jury,[6] and one count of misprision of a felony.[7] He was not alleged to have been a member of the conspiracy to kill Orlando Letelier, nor to have participated in the murders in any way. He was tried, however, with co-defendants Guillermo Novo and Alvin Ross Diaz who were charged in additional counts as follows: (1) conspiracy to murder a former foreign official, 18 U.S.C. § 1117; (2) murder of Letelier, 18 U.S.C. §§ 1111, 1116; (3) murder of Letelier by explosives, D.C.Code, § 22–2401; (4) murder of Moffitt by explosives, D.C.Code, § 22–2401; (5) destroying vehicle and killing Letelier and Moffitt by explosives, 18 U.S.C. § 844(i); (6) and (7) false statements by Guillermo Novo before the grand jury, 18 U.S.C. § 1623. Although Ignacio Novo (hereafter, Ignacio) raises several issues on appeal, we need only determine whether the district court's failure to sever the trial of Ignacio from that of his co-defendants constitutes reversible error.

> TENTH COUNT:
> From on or about September 21, 1976, and continuing thereafter through the date of the return of this indictment, within the District of Columbia and elsewhere, IGNACIO NOVO, having knowledge of the actual commission of a felony cognizable by a court of the United States, that is, the murder of Orlando Letelier and Ronni Moffitt on September 21, 1976, did conceal and did not as soon as possible make known the same to a judge or other person in civil authority under the United States.
> (In Violation of Title 18, United States Code, Section 4).

Ignacio suggests several grounds upon which he argues severance should have been granted. These include (1) denial of his right under the Sixth Amendment to confront and cross–examine witnesses against him; (2) denial of his right to introduce exculpatory evidence; (3) the prejudicial spill–over of evidence introduced with respect to other crimes committed by Guillermo Novo and Ross; (4) confusion of the evidence against him with evidence against his brother Guillermo and confusion of the charges against each; and (5) the tremendous difference in the magnitude of the charges against his co–defendants and the charges against him. More specifically, Ignacio argues, severance was necessitated by the great disparity between the severity of the crimes charged against Ignacio, and those charged against his brother Guillermo and Ross, his other co–defendant. As the number of witnesses, amount and impact of testimony, and the gravity of the offenses involving his co–defendants far exceeded that which was admissible against Ignacio, he alleges that he was prejudiced by the inevitable spill–over of evidence against his co–defendants but not admissible as to him. Second, Ignacio argues that he was implicated at trial by the admission of statements by his co–defendants, and by witness Canete, but was not able to exercise his Sixth Amendment right to confront and cross–examine them as witnesses against him.

We hold that the joint trial of Ignacio on counts of false statements to a grand jury and misprision of a felony with co–defendants charged with conspiracy to assassinate Letelier and the murders of Letelier and Moffitt, was improperly prejudicial to Ignacio. When during the trial it became apparent that Ignacio's guilt or innocence might well be confused with that of his co–defendants, and when Ignacio's right to cross–examine and present his defense was impaired by his joint trial, we believe the

district court abused its discretion in denying Ignacio's motion to sever his trial.[8] We reverse the conviction, relying upon three sets of factual circumstances that support our judgment ordering a separate trial.

(1) *Confusion of the Charges and Evidence*

We start with the premise that a defendant in a joint trial has a recognized right to a "severance of defendants or . . . whatever other relief justice requires" if it appears that he is "*prejudiced* by a joinder of offenses or of defendants in an indictment . . . or by such joinder for trial together . . . ."[9]

Even before trial had commenced, the joint trial of defendants on charges growing out of the same underlying event–the assassination of Orlando Letelier–but premised upon entirely disparate levels and allegations of culpability, foreshadowed confusion of the evidence and prejudice to Ignacio.

The First Count of the indictment lists the Grand Jury's charges against all the co–conspirators charged with the murder of Letelier. While Ignacio was not charged with conspiracy or any role in the commission of the crime, sections 2(f), 2(g) and 4 of the First Count nevertheless state:

2(f) At all times during the period of the conspiracy, the *Cuban Nationalist Movement*, also known as CNM, CMN and MNC, was a Cuban exile group based in the United States.

(g) At all times during the period of the conspiracy, GUILLERMO NOVO, ALVIN ROSS, VIRGILIO PAZ, JOSE DIONISIO SUAREZ AND *IGNACIO NOVO* were *leaders* of the *Cuban Nationalist Movement* and *members of its governing council.*

4. . . . All the *participants in the conspiracy* were aware that the conspiracy would encompass and depend upon the

---

8. Counsel for Ignacio Novo made several motions for severance both before and during trial. (Tr. 38–46: pre–trial; 1712: after Michael Moffitt's testimony; 1240–1248: after Townley's testimony.)

9. Fed.R.Crim.P. 14.

combined, coordinated efforts of members of two organizations–DINA and the Cuban Nationalist Movement. (emphasis added throughout)

Section 5 of the First Count of the Indictment then states:

5. In pursuance of the said conspiracy and to effect its object, to kill Orlando Letelier, the following overt acts, among others, were committed in the District of Columbia and elsewhere:

... 38. On or about September 21, 1976, within the State of Florida, Michael Townley *telephoned Igancio Novo*, whereupon *Novo told him* that something had happened in the District of Columbia.

39. On or about September 21, 1976, within the State of Florida, Michael Townley met with *Ignacio Novo* and *briefed him* about the mission in the Washington, D.C. area (emphasis added)

The impact upon the jury of these allegations referring to Ignacio in that count of the indictment charging conspiracy to assassinate Letelier must have been substantial. While Ignacio was not charged with the actual murder of Letelier, Ignacio and the organization of which he was a "leader" and a "[member] of its governing council", the Cuban Nationalist Movement (CNM), are mentioned prominently and repeatedly throughout the conspiracy count of the indictment. Likewise there was extensive evidence introduced at trial which implicated the CNM. The Cuban Nationalist Movement, and by implication, Ignacio, one of its "leaders" and council members, were implicitly put on trial as parties to the conspiracy which was alleged to involve the "coordinated efforts of members of two organizations–DINA and the Cuban Nationalist Movement." *Indictment, First Count, 4.* Since the jury found Ignacio's two co–defendants guilty of this conspiracy, and the executed murders that resulted from said conspiracy, it is asking too much to expect this court to hold on the basis of the evidence, involving as it did the Cuban Nationalist Movement, of which Ignacio was the only "leader" and council member not named as a murderer, that the joinder of

Ignacio with the principals in the conspiracy and murder did not create improper prejudice against him. The evidence of guilt by association appears unmistakably in the most classic sense of the phrase.

Actual testimony at trial also created the false impression that Ignacio was involved in the conspiracy. When Michael Townley was testifying to discussions he had with members of the Cuban Nationalist Movement in which he "explained the mission, which was to kill–to assassinate Orlando Letelier", he stated he was told by Guillermo and Suarez that they would have to "effect" the request for the assistance of the CNM "with other *director members* of the movement." (Tr. 1667–1670). Townley followed this up by testifying as to "any conversation ... with Guillermo Novo or Virgilio Paz or any other member of the Cuban Nationalist Movement with respect to what the Cuban Nationalist Movement wanted from Chile or DINA ...":

"THE WITNESS: I can say that all of the telephone conversations that I remember at this moment have been either with Virgilio Paz, Guillermo Novo–on one occasion with Alvin Ross–that I can remember, and *possibly one occasion with Ignacio Novo.*" (Tr. 1671) (emphasis added).

Shortly thereafter, counsel for Ignacio moved unsuccessfully to sever his client's trial and the court reserved its ruling (Tr. 1712). The motion was never granted. The trial judge first instructed the jury that the testimony could not be considered with respect to Ignacio Novo since he was not named as a part of the conspiracy (Tr. 1715), but then amended that instruction to remind the jury that Ignacio was charged with misprision and making false statements to a grand jury, and that the evidence could be considered in that light. (Tr. 1716). The relevance of Townley's testimony to the charges against Ignacio makes it all the more prejudicial because it intertwined Ignacio, a leader and council member of CNM, with those defendants who were charged with the conspiracy and murders.

Although the court's instructions were conscientious attempts by the trial court to limit the admission of evidence for only relevant purposes against Ignacio, the nuances and the breadth of some of the testimony made it inevitable that Ignacio would be prejudiced by the simultaneous presentation of testimony relating to the conspiracy and murder counts, with which Ignacio was not charged, and the misprision and false statements counts, with which he was. The testimony left the clear inference that although not charged, there was the definite possibility that Ignacio was in reality a co-conspirator, because of the indictment's references to him, to the CNM and to the "director members of the movement," and because of testimony by Townley that Ignacio "possibly" participated in the conspiracy. (Tr. 1671) However, our decision is not based upon these circumstances alone. We examine the record further to determine whether Ignacio was also prejudiced by his joint trial with defendants accused of such grossly disparate crimes.

(2) *Joint trial on grossly disparate charges*

Our decision in *United States v. Mardian*, 546 F.2d 973 (D.C.Cir.1976), involved facts with some similarities to those present here. In *Mardian* we reversed the conviction of Robert Mardian because he had been tried jointly with three of the principal members of the Watergate conspiracy, all of whom had played much more substantial roles in the crime over much longer periods. We also relied in *Mardian* upon the fact that he lost the service of his lead counsel due to illness two weeks into the trial. Our reversal was based on both circumstances but Mardian's strong showing of likely prejudice from his joint trial was the principal basis for our decision to reverse because of the denial of the severance.

Because *Mardian* was based upon these two primary considerations, it does not control the result here but it has a persuasive influence. The present case, however, possesses strong factors requiring severance in their own right, many of which were also present in *Mardian*. We began in *Mardian*, as is proper here, by recognizing that since motions for severance are committed to the discretion of the trial court, denials of severance will be reversed only for an abuse of discretion. F.R.Crim. 14; *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *Mardian, supra*, at 977. However, we were greatly influenced by the circumstance of Mardian's trial alongside his alleged co-conspirators who were more certainly involved, and realized that the " 'dangers of transference of guilt' are such that a court should use 'every safeguard to individualize each defendant in his relation to the mass,' " quoting *Kotteakos v. United States*, 328 U.S. 750, 773, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946); *Mardian, supra* at 977.

We then examined factors peculiar to Mardian's joint trial that supported his motion for severance. First we noted a great disparity in the weight of the evidence against the defendants, and opined that, as in the Second Circuit's decision in *United States v. Kelly*, 349 F.2d 720, 759 (1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), there was a danger that guilt felt by the jury to adhere to some of the defendants might "rub off" on others also to be judged. In other cases this court has expressed the principle similarly, requiring severance when the evidence against one or more of the defendants is "far more damaging" than evidence against the party seeking severance. *Compare McHale v. United States*, 398 F.2d 757, 758 (D.C.Cir.1968), *cert. denied*, 393 U.S. 985, 89 S.Ct. 462, 21 L.Ed.2d 447 (1968) *with United States v. Bolden*, 514 F.2d 1301, 1310 (D.C. Cir.1975). Mardian pointed out that he had been indicted for only one of several counts that were alleged against his co-defendants, and that for that one count, conspiracy, Mardian was alleged to have been involved in only 5 of the 45 overt acts in pursuance of the conspiracy. Most significantly, Mardian's alleged involvement was very minimal in the early days of the conspiracy and he was not charged with any activity during the last two years of the conspiracy.

Because Mardian's role in the conspiracy was far smaller than that of the other defendants, most of the testimony at trial focused on events that even the government's testimony admitted had occurred after Mardian had voluntarily withdrawn from the conspiracy—if he ever had been a member. The government played 30 taped conversations between the co–conspirators, but Mardian was not a participant in any of them. He was mentioned by name five times, however, and we intimated without ruling on the point that such references might have been inadmissible because of their highly prejudicial impact. 546 F.2d at 978, n. 6. We also determined that a separate trial of Mardian would not be burdensome to the courts or prosecutors, since Mardian's limited involvement "would likely require only a short trial and a fairly small number of witnesses". 546 F.2d at 980–81.

While we recognize that conservation of time necessarily expended in the criminal judicial process provides strong support for the joint trial of defendants indicted together, see *United States v. Hines*, 455 F.2d 1317, 1334 (D.C.Cir.1971), *cert. denied*, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); *United States v. McDaniel*, 538 F.2d 408, 410 (D.C.Cir.1976); *Mardian, supra*, at 979, the particular factual circumstances here serve as counterweight to that rationale, and require severance of Ignacio Novo's trial. Holding up the *Mardian* case for comparison, we perceive certain differences, but primarily similar considerations determine our result.

The fact that Ignacio Novo was not charged as a conspirator cuts both ways. As he was charged with crimes distinct from his co–defendants, the jury might have been able to segregate the evidence of offenses charged against each defendant in its deliberations. On the other hand, this deprives the prosecution of a large part of its rationale for trying the defendants together. The long stream of witnesses testifying to the details of the assassination conspiracy and the actual assassination provided testimony that was largely irrelevant to Ignacio's guilt, whereas Mardian was charged as a conspirator, and was therefore chargeable with all acts committed in pursuance of the conspiracy as testified to at trial.

■ We are not prepared to say that the weight of the evidence against Ignacio was less substantial than that submitted against his co–defendants, as was found to be the case in *Mardian* and *Kelly*. But we consider that this case illustrates that not only the weight of the evidence, but also the quantity and type of evidence adduced against the co–defendants, is a vital consideration in evaluating the necessity for severance. The Second Circuit in *Kelly, supra*, at 759, found that the large amount of evidence establishing appellant's co–defendants' "shameless" "fraudulent practices . . . must have stamped them in the eyes of the jurors as unscrupulous swindlers of the first rank. That some of this rubbed off on [appellant] we cannot doubt," the court declared.[10]

To speak in terms of "transference" or "rubbing off" of guilt, classic expressions used to explain why severance is justified in a particular case, would be to downplay the prejudice that Ignacio was subjected to in a joint trial alongside two men on trial for the bombing murder of two people. Alvin Ross and Guillermo Novo were not being tried for negligent homicide, or reckless manslaughter, but were accused of participating in an intentional and extremely violent assassination scheme, the gory details of which were described with extreme accuracy to the jury. While in this opinion we hold that the testimony of witnesses to this

---

10. The decision in *Kelly* also relied upon facts unique to that case, not present here. For example, the court found that the cautionary instructions given by the trial judge were "mild and ineffectual", contrary to our feeling here that the district judge, once he had decided not to sever the trials, did his best to remind the jury of the separate charges against the individual defendants.

The trial judge in Kelly also erred in giving the "all or nothing" charge, whereby the jury could not find that a single defendant was not a member of the conspiracy while finding the others guilty. 349 F.2d at 757, 758.

murder was not improperly inflammatory or prejudicial to defendants Ross and Guillermo Novo because of their direct involvement in the conspiracy and substantive crimes, precisely the opposite conclusion is reached for defendant Ignacio Novo. He was not charged with the conspiracy or murders, but still he was required to sit in court while the emotion–charged testimony was unveiled to the jury and to hear his name bandied around the fringes of those offenses as one of the "leaders" and council members of an admittedly participating organization–the CNM. The amount and provocative nature of the evidence required to prove the charges against his co–defendants so exceeded and varied from that which was necessary or relevant to the charges against Ignacio that it was unfair to him, and unrealistic to expect a jury not to be influenced by such extraneous testimony in its assessment of his guilt upon the lesser charges for which he was tried.

In such cases when there is a gross disparity in the quantity and venality of the testimony against the respective joint defendants it is fair to inquire "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility." *United States v. Gaines,* 563 F.2d 1352, 1355 (9th Cir. 1977); *United States v. Milham,* 590 F.2d 717 (8th Cir. 1979). Applying this standard to this case, we would find it *unreasonable* to expect that the jury succeeded in compartmentalizing the evidence adduced at this trial. This conclusion in no small part is based upon the fact that evidence at trial, and even the indictment, failed to compartmentalize the evidence for the benefit of the jury. Although the judge faithfully instructed the jury to consider the evidence against Ignacio only in the light of the charges against him, such

instructions could not provide their intended protection against prejudice in the face of this emotional evidence that repeatedly attributed responsibility for the murder to the Cuban Nationalist Movement, of which Ignacio was a member of its council, one of its leaders, and frequently mentioned by name in such connections. Nor does it escape our attention that Ignacio's brother, Guillermo, was a co–defendant who was charged in both the conspiracy and murders–and also in two false statement counts. And on one occasion the confusion was so great that one of the witnesses at the trial, describing a meeting in Venezuela, named Guillermo but pointed to Ignacio. (Tr. 1405).[11] No curative instruction was given. Perhaps this misidentification symbolized the inevitable failure of this particular joint trial. There was never the clear distinction between the different defendants and the evidence against each of them that is called for by the Constitution's guarantee of a fair trial. Some of the evidence that was relevant to the conspiracy and murders was also relevant to the charges against Ignacio–it was thus difficult to sort out the testimony that was relevant *only* to the conspiracy and murders from that which was properly relevant to such charges and those against Ignacio.

We note finally that the vast *bulk* of the testimony concerned the crimes of conspiracy to assassinate and murder [12] for which Ross and Guillermo Novo were being tried. Not only has this been considered in the past to suggest prejudice, *see, e. g., United States v. Donaway,* 447 F.2d 940, 943 (9th Cir. 1971); *Mardian, supra* at 978, but it also suggests that the separate trial of Ignacio would not have been an outsized burden upon the judicial system. As in *Mardian,* separate proceedings against appellant Ignacio would require only a short trial, with a small number of witnesses. When

11. The witness was Rafael Rivas Vasquez, Deputy Director of the Venezuelan Intelligence Service. He first identified Ignacio Novo as Guillermo Novo, then testified that he had met him in Caracas, Venezuela in 1974, along with Orlando Bosch, and Dionisio Suarez. (Suarez was an absent indicted co–conspirator in this case). Vasquez further testified that Novo indicated that the three of them were on their way to Chile (Tr. 1403–05).

12. Guillermo was also charged in two counts of false statements before the grand jury. See p. 629, *supra.*

balanced against the lesser interests supporting joint trial, the separate trial of Ignacio was not only prudent but required as well.

### (3) *Denial of Cross–Examination and Presentation of Exculpatory Evidence*

Appellant Ignacio also claims that the trial judge's refusal to sever his trial caused a violation of his Sixth Amendment right to confront and cross-examine witnesses.[13] While we do not find this ground to be conclusive of itself, his joint trial did deprive Ignacio of at least some opportunity to cross-examine witnesses and introduce evidence. Furthermore, the adverse testimony of which he complains heaped further confusion upon the jury in its uphill fight to disregard the continuing oblique references to Ignacio's proximity to the conspiracy. Since Ignacio was not able to cross–examine as to some statements that implicated him in both the crimes for which he was charged and those for which he was not, we find this denial of cross–examination to be a third, albeit lesser factor upon which we premise our reversal.

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a witness testified that Bruton's co–defendant Evans had confessed to both defendants that he had participated in a robbery for which they were jointly being tried. Evans did not take the stand, and the judge instructed the jury that his confession was admissible only in deciding his guilt, and not that of Bruton. Although both defendants were convicted, the conviction of Evans was later set aside, *Evans v. U. S.,* 375 F.2d 355 (8th Cir. 1967), because his oral

confession had been made in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 and *Westover v. United States,* 384 U.S. 436, 494, 86 S.Ct. 1602, 1638, 16 L.Ed.2d 694 (1966). Reviewing the conviction of Bruton, the Supreme Court held:

> because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross–examination secured by the Confrontation Clause of the Sixth Amendment.

391 U.S. at 126, 88 S.Ct. at 1622.

Ignacio claims that three statements made by his co–defendants that were repeated by witnesses at trial fit him within the *Bruton* doctrine, since his co–defendants did not take the stand. Ignacio avers that he was incriminated by the statements, but nevertheless could not cross–examine those whose statements constituted probative evidence against him. The statements that Ignacio cites as implicating him in the conspiracy include: 1. Testimony by Ricardo Canete that Paz and Ross admitted "*we* did it". (Tr. 3286). (emphasis added). 2. Testimony by Antonio Polytarides that Guillermo Novo stated, "*[w]e* have been betrayed by certain persons, but *we* will pay them back". (Tr. 4177). (emphasis added) 3. Testimony by Sherman Kaminsky that Ross acknowledged that he and "*other members* of the Cuban Nationalist Movement in this country" were involved in the murder [14] (Tr. 4350) (emphasis added)

---

**13.** The confrontation clause of the Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .") includes the right to cross–examine adverse witnesses. The Supreme Court has endorsed the view that denial of cross–examination "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it". *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

**14.** Earlier in this opinion, we reverse appellant Ross' conviction because Kaminsky's testimony violated Ross' Sixth Amendment right to counsel. While Kaminsky's statements would probably not be found inadmissible against Ignacio on these grounds, *cf. United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *United States v. Salvucci,* —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky,* —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the statements were prejudicial to Ignacio, and he had no opportunity to cross–examine Ross, to whom the statements were attributed.

While Ignacio correctly asserts that he was denied the opportunity to cross–examine the authors of these confessions, their contents are not so clearly incriminatory as was the confession in *Bruton*. The confession of Bruton's co–defendant Evans was particularly damaging to Bruton because it incriminated both Bruton and Evans in the crime for which they were jointly tried. In this case, however, the statements of Ignacio's co–defendants do not refer to him by name, nor was he on trial for the conspiracy and murder charges. At least in the formal sense, then, it cannot be said that as in *Bruton*, the statements were "powerfully incriminating" or "devastating" to Ignacio, 391 U.S. at 135–36, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 since the jury was not supposed to adjudicate Ignacio's guilt on the charge of conspiracy. But this brings us back to our earlier point. The numerous references to the participation of the Cuban Nationalist Movement in the conspiracy and to the additional testimony that Ignacio was one of its leaders and a member of its council, created a substantial risk that such testimony would influence the jurors in their consideration of Ignacio's guilt on the false statements and misprision charges. So while the denial of cross–examination may not technically have deprived Ignacio of the opportunity to rebut the *charges* against him, neither was he able effectively to counter the inevitable prejudice that airing of the conspiracy testimony and the involvement therein of the CNM occasioned to the trial on his charges.

Ignacio's second claim of prejudicial denial of cross–examination at first seems to fit more squarely within the line of cases pro-

tecting defendants' right to cross–examine, since the testimony he objects to related directly to one of the offenses charged against Ignacio. Ricardo Canete testified at trial that he sold false identification papers to Ignacio and his brother Guillermo was found to be in possession of the identification papers when he was arrested in Miami. The government relied upon this as one of its three tendered pieces of evidence that Ignacio was guilty of the misprision charge, arguing that Ignacio's securing of the false identification for Guillermo was an affirmative act taken to conceal his brother's participation in the murder of Letelier. Defense counsel argued at a bench conference, however, that Ignacio had procured the false identification to enable his brother to flee a parole revocation in New Jersey that was unrelated to the murder. Canete had told federal investigators that Ignacio mentioned such a motive during their conversations. Yet Ignacio was unable to introduce this testimony since counsel for Guillermo Novo was sustained in his objection to admission of "other crimes" evidence that would have been prejudicial to his client. (Tr. 5092). *See* F.R.Ev. 404(b).

■ However, Ignacio, is only partially correct in asserting that his joint trial prevented him from cross–examining Canete and gaining admission of what he termed exculpatory evidence. Defense counsel at the bench conference argued that Ignacio's motive in securing the false identification was to enable Guillermo's flight from the parole violation (Tr. 3097–98) and though the court disallowed certain testimony by Canete,[15] he did not rule whether cross–ex-

---

**15.** The judge's rulings culminated a lengthy bench conference (Tr. 3097–3150) in which defense counsel argued and implied that certain portions of Canete's proffered testimony would prejudice both Ignacio and Guillermo, because of restrictions on cross–examination. According to defense counsel, Guillermo would be prejudiced by Canete's testimony that Ignacio had told him he needed the identification for someone who had "left a body behind". Since the identification document was later shown to be in the possession of Guillermo, this statement by Ignacio would incriminate Guillermo,

but since Ignacio would not during the trial take the stand, Guillermo would be denied an opportunity to cross–examine the maker of the statement. Counsel for Guillermo stated that he would move for severance of Guillermo's trial if this statement were admitted (Tr. 3109, 3128), but the court later ruled that this statement was inadmissible because of its prejudicial impact. (Tr. 3217).

This conference also discussed the effect of eliciting from Canete that Ignacio had mentioned that he wanted the false identification to enable Guillermo to flee from a parole viola-

amination of Canete to elicit Ignacio's statement about Guillermo's flight from the parole violation would be allowed or disallowed. There is no record of attempted cross–examination of Canete on this point by Ignacio's counsel. Hence, it is inaccurate for Ignacio to now argue that he was denied the opportunity to cross–examine Canete, since no formal proffer was made or rejected.[16]

The government does not make this point, but attempts to counter appellant's argument by reference to the Third Circuit's decision in *United States v. Boscia,* 573 F.2d 827 (1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). In *Boscia,* defendants averred that had their trials been severed, they would have been able to call their co–defendants as witnesses and elicit exculpatory testimony. The court, however, examined the degree of likelihood that the co–defendants would have testified, that the evidence would have been exculpatory, and that the co–defendants' testimony could have been impeached. Reasoning that there was no showing that the co–defendants would testify, and that if they did their evidence would be cumulative and impeachable, the court found no prejudice in this speculative claim. 573 F.2d at 832.

Although we may gain guidance from *Boscia,* such inquiries into rebuttal examination that might have occurred are themselves speculative. So, if Ignacio can show a reasonably exculpatory piece of evidence that was inadmissible because of the joint trial, we are inclined to find some prejudice. This we have here, since as defense counsel argued to the court, (Tr. 3097–98, 3104–06),

Guillermo Novo had been in the country for ten months after the assassination, and for eight months after testifying before the grand jury. These circumstances created at least an inference that he was getting the false identification papers so he could leave the United States for another reason than to escape the Letelier investigation and to conceal his participation in that murder. Defense counsel also pointed out that Guillermo had been informed that a hearing on his parole violation (leaving the state–New Jersey–without permission) would be held. This case is thus distinguishable from *Boscia* since the exculpatory evidence to be proffered is stronger.

The government, however, argues that it would have rebutted such an inference with testimony that Ignacio had told Canete that he needed the identification for someone who had "left a body behind". This testimony was excluded at the joint trial, because of possible prejudice to Guillermo Novo. (Tr. 3107–3110, 3216–27). While such testimony might well have rebutted Ignacio's claim in the eyes of the jury, we cannot say that this argument convinces us that Ignacio was not harmed by the denial of his opportunity to present this testimony and to argue that it was exculpatory. We are willing to speculate that Ignacio's evidence might have been helpful to his defense on the misprision count, but to the second level of speculation we will not go. The jury might have accepted Ignacio's version of his motive. We will not attempt to decide what Ignacio intended to accomplish by securing the false identification as that essentially is a jury issue. The joint trial of

tion. Counsel for Guillermo Novo argued that this was Ignacio's true motive, but did not make any specific references to prejudice that might inure to his client, or to Ignacio.

After the trial testimony had been completed, during motions for directed verdict for insufficiency of the evidence, counsel for Ignacio alleged that since Ignacio's motive in supplying the false identification to Guillermo was unrelated to the murder, there was insufficient evidence to convict Ignacio of misprision of the murder. The judge said that he would allow counsel for Ignacio to argue that factual ques-

tion to the jury, but counsel for Guillermo interjected that he would not, implying that this "other crimes" evidence would be prejudicial to his client. (Tr. 5092)

16. Nevertheless, as Ignacio might have benefitted from arguing this point before the jury, but could not do so because of the prejudice that would have inured to his co–defendant and brother, Guillermo, it must be concluded that the joint trial of the brothers in this respect did, to some extent inhibit Ignacio's presentation of his defense.

Ignacio and Guillermo impeded presentation of this feature of Ignacio's defense on a key element of one of the crimes charged, and we consider this as additional support for the conclusion that severance of Ignacio's trial was necessary in these circumstances.

In conclusion, we find that the cumulation of circumstances above set forth required severance of the trial of Ignacio Novo from that of his brother Guillermo Novo and Ross, and that its denial deprived him of the fair trial to which he was entitled. We base this holding upon the confusion of the charges that resulted from the indictment and evidence at trial, upon the likelihood of prejudice brought about by the joint trial on charges of assassination with such grossly disparate charges as false statement and misprision, and upon the inability of Ignacio to present a full defense and cross–examine witnesses implicating him inferentially in crimes for which he was and was not charged.

For the foregoing reasons we vacate the judgments of conviction of Ignacio Novo on the Eighth, Ninth and Tenth Counts and remand the case for his separate trial on said counts.

## B. THE VALIDITY OF CONSECUTIVE SENTENCES FOR MISPRISION AND FALSE DECLARATIONS

Appellant Ignacio Novo Sampol (hereafter Ignacio) was charged with and convicted of two counts of false declarations (18 U.S.C. § 1623) and one count of misprision of a felony (18 U.S.C. § 4). He was sentenced to concurrent five years imprisonment on each of the false declarations counts and to three years imprisonment on the misprision count. The latter sentence was adjudged to run consecutively to the five year sentences. In his appeal Ignacio contends that the constitutional doctrine of double jeopardy bars consecutive sentences on the false declaration counts and the misprision count. We agree.

■ The Double Jeopardy Clause of the Fifth Amendment states that no "person [shall] be subject for the *same offence* to be twice put in jeopardy of life or limb". (Emphasis added) This protects defendants not only against a second trial for the same offense, but also against multiple punishments for the same offense. *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), citing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

*Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1943) lays down the controlling rule for determining whether prohibited double punishment is being imposed for the *same offense*:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether *each* provision requires proof of an additional fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182. (Emphasis added).

■ Justice Stewart's opinion in *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), interprets D.C. Code § 23–112 to the same effect, viz., "that multiple punishments cannot be imposed for two offenses arising out of the same criminal transaction unless *each* offense 'requires proof of a fact which the other does not.'" 445 U.S. at 691, 100 S.Ct. at 1438 (Emphasis added), citing *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. "The legislative history rather clearly confirms that Congress intended the federal courts to adhere strictly to the *Blockburger* test when construing the penal provisions of the District of Columbia Code." 445 U.S. at 692, 100 S.Ct. at 1438.

Applying this test to the instant case, we look to each crime the government proved and the elements thereof. The two counts of making false declarations before the grand jury were charged in the Eighth and

Ninth Counts under 18 U.S.C. § 1623,[17] and alleged:

> On or about October 29, 1976, within the District of Columbia, IGNACIO NOVO, while testifying before a Grand Jury of the United States, duly sworn in on October 20, 1975, in the United States District Court for the District of Columbia, and having taken an oath that he would testify truly, did wilfully, knowingly and contrary to such oath, make false material declarations as hereinafter set forth.

The indictment then recites the purpose of the grand jury investigation, avers that Ignacio Novo's statements were material to the investigation, and lists those statements alleged to have been made knowingly and falsely.

The Tenth Count of the joint indictment charged Ignacio Novo with misprision of a felony in violation of 18 U.S.C. § 4: [18]

> From on or about September 21, 1976, and continuing thereafter through the date of the return of this indictment, within the District of Columbia and elsewhere, IGNACIO NOVO, having knowledge of the actual commission of a felony cognizable by a court of the United States, that is, the murder of Orlando Letelier and Ronni Moffitt on September 21, 1976, did conceal and did not as soon as possible make known the same to a judge or other person in civil authority under the United States.

■ It is obvious from their wording that the two statutes do not prohibit what would ordinarily be termed the same offense. But the prohibition in the Constitution against placing an accused twice in jeopardy "for the *same offense*" is directed at the actual *"offense"* with which he is charged and not only at the violated statutes. The Constitution does not permit convictions for the "same offense" if they are charged under different statutes even though violations of the two statutes would normally not constitute double jeopardy. In determining whether a defendant is being subjected to double jeopardy the statutory elements of the offenses may however play a material part. Accordingly we must examine the statutes, the offenses as charged in the indictment, and the evidence and procedures at trial.

The provisions of the statute prohibiting false declarations, and the offenses as charged in the indictment, are set forth and described above. In his summation to the jury the trial court correctly analyzed the essential elements of the crime and after describing the statute and the charges of the indictment stated:

> There are four essential elements required to be proved in order to establish the [false declaration] offenses charged in the indictment.
>
> As far as those counts are concerned, first, that the testimony was given, after each defendant was placed under oath before a United States grand jury.
>
> Second, that the testimony so given was false in one or more respects charged.
>
> Third, that the testimony concerned matters that were material to the grand jury investigation.

17. 18 U.S.C. § 1623 provides:
 § 1623. False declarations before grand jury or court
 (a) Whoever under oath (or in any declaration, certification, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 \* \* \* \* \* \*
 (e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence.

18. 18 U.S.C. § 4 provides:
 § 4. Misprision of felony
 Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.

And, fourth, that the false testimony was knowingly given as charged.

Tr. 5555.

The trial court then turned to the misprision offense as charged against Ignacio in the Tenth Count. After describing the statute and the charges the court then outlined the essential elements of the offense of misprision to the jury as follows:

The essential elements of that crime [misprision], each of which the Government must prove beyond a reasonable doubt are as follows:

First, that the defendant had knowledge about the facts and circumstances of a felony.

No. 2. That the felony was committed within the jurisdiction of the United States.

Thirdly, that the defendant concealed his knowledge of the crime from appropriate investigatory or judicial authorities.

Four, that the defendant took affirmative steps to conceal the crime. To commit the crime, imprision [sic] [misprision] of a felony the defendant's knowledge must be actual and his concealment must be purposeful and deliberate.

It is not necessary however that the defendant in any way participated in the crime, only that he had knowledge of it and did not make that fact known to the appropriate authorities.

Tr. 5558–59.

In the ordinary case, violations of the two statutes in question do not amount to the same offense. Certainly there are many cases of misprision that would not involve proof of making false statements to a grand jury, and there are many imaginable instances of making false declarations to a jury that would not entail concealment of a felony. But the government charged and proved Ignacio's false declarations to the grand jury with respect to the murders as one of three alleged affirmative acts taken by Ignacio to conceal the murders which were the objects of the concealment charged in the misprision count. While in order to prove misprision it was only necessary that the government prove that Ignacio committed one affirmative act to conceal the crimes, the government obviously thought it would strengthen its case to present evidence of three alleged acts of concealment upon which the jury could base its verdict of guilt.[19]

For the jurors to convict Ignacio Novo of the two counts of making false declarations to the grand jury, they had to find that Ignacio had knowledge of the murders and wilfully answered falsely under oath before the grand jury to the government's specific queries about his knowledge. Proof of these elements, however, also constituted proof of the factual elements of the misprision charge. Misprision basically requires knowledge of the commission of a felony, and wilful concealment from the authorities by some affirmative act. A finding that Ignacio wilfully lied about his knowledge of the assassination to the grand jury investigating the Letelier assassination is equivalent to concealment from the authorities. *The government even admitted at oral argument that proof of the false statements alone was sufficient proof of the misprision charge.* Under such circumstances *the false declarations offense admittedly included all the elements of the misprision charge.* The false declarations offense does include one element–making the false statement *under oath* before the *Grand jury*–which is some proof of misprision but not an element thereof. However, applying *Blockburger* to the evidence of false declarations which proved the misprision charge there is *no essential* element of the misprision offense that is not also an element of the false

---

**19.** The government claimed that: 1. Ignacio Novo lied to and evaded the questions of FBI agent Ovidio Cervantes, in denying knowledge of the bombing, or the involvement of members of the Cuban Nationalist Movement. 2. Ignacio secured false identification from Ricardo Can- ete for the purpose of aiding his brother Guillermo's flight from the government's investigation of the assassination. 3. Ignacio made false statements to the grand jury concerning his knowledge of the assassination and thereby concealed the felony.

declarations charge and proved by proof of the latter offense. The consecutive sentences imposed for violation of the two statutory offenses is thus invalid under the *Blockburger* test, since "each ... [offense does *not* require] proof of an additional fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182. Therefore, the offense of making false declarations to the grand jury as proved at trial included the offense of misprision as charged in the indictment and proved at trial and the dual sentences violated the guarantee against double jeopardy.

Decisional law in this circuit routinely applies the *Blockburger* test to guard against the imposition of double punishment for the same offense. In *United States v. Greene*, 489 F.2d 1145, 1158 (D.C. Cir. 1973), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974), we found that the charge of felony murder included every essential fact element of the underlying felony charge of rescue. The lesser charge of rescue therefore was included in the greater charge of felony murder and imposition of consecutive sentences was held to be improper. Accordingly, conviction of the defendant on the rescue charge was vacated. The Supreme Court approved the holding of *Greene* in *Whalen v. United States, supra*, 445 U.S. at 694, 100 S.Ct. at 1439.

Applying similar reasoning, in *United States v. Benn*, 476 F.2d 1127, 1132 (D.C.Cir. 1972), we discerned that a charge of assault with a dangerous weapon was an included offense of a charge of assault with intent to commit rape while armed. Proof of the elements of the earlier charge would also be proof of the elements of the latter charge, our court held, and accordingly conviction on the included offense was barred.

The Supreme Court recently made it plain that the prohibition of double jeopardy may depend upon the particular circumstances of a case. In *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715, *supra*, petitioner was convicted both of rape and of killing the same victim in the perpetration of rape. The latter offense proscribed the killing of a human being in the course of any of six felonies, of which rape was one. The Court rejected the government's argument that since felony murder did not in all cases require proof of rape, separate counts charging felony murder in perpetration of rape and rape were not for purposes of the double jeopardy provision the "same" offense under *Blockburger*. The Court thus applied the theory behind the Double Jeopardy Clause to circumstances, somewhat similar to this one, in which the particular facts of the offenses as charged under two statutes created a greater and an included offense.

Thus, when the elements of the two offenses as charged in the indictment are compared it is apparent that Ignacio's false declarations to the grand jury, which concealed his knowledge, also concealed the commission of the felony from the grand jury. This evidence satisfied the required elements of misprision as set forth in the court's instructions to the jury: first, the evidence indicated that Ignacio had knowledge about the facts and circumstances of the felony; second, that the felony was committed within the United States; third, that the grand jury was an "appropriate investigatory or judicial authority;" and, fourth, that Ignacio in testifying falsely before the grand jury "took affirmative steps to conceal the crime." The evidence also indicated that Ignacio did have actual knowledge and that his concealment was "purposeful and deliberate." (Tr. 5558–59). As noted in n.19, *supra*, other evidence was offered to support the misprision charge,[20] but the false statements to the grand jury were the strongest and the most complete proof of misprision. The statements before the grand jury were also given under oath.

---

**20.** The false statements to Agent Ovidio Cervantes, an agent of the Federal Bureau of Investigation (FBI), were also made to an "appropriate investigatory authority" and would constitute proof of "affirmative steps to conceal the crime." However, Ignacio's obtainment of false identification materials from Ricardo Canete to aid his brother Guillermo did not satisfy all the elements of misprision.

Since there is no way of knowing whether the jury relied solely upon Ignacio Novo's false declarations to the jury in convicting him on the misprision charge, as it could have, it is impossible for us to determine precisely whether appellant was unconstitutionally punished twice for the same offense. The evidence of the false declarations was admittedly sufficient to support the misprision charge and there is a tangible danger that the trial jury may have relied solely on such evidence in returning the guilty verdict on the misprision charge. Therefore, to avoid gambling with appellant's constitutional rights, if we had not vacated the misprision conviction for failure to sever, we would vacate the judgment imposing appellant's consecutive sentence on the charge of misprision. *See Street v. New York*, 394 U.S. 576, 585–86, 89 S.Ct. 1354, 1362, 22 L.Ed.2d 572 (1969); *Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931).

On a retrial, the Government may elect which charges are to be prosecuted or in its proof of misprision may elect to exclude evidence of false statements before the grand jury. In any event, consecutive sentences upon the respective misprision and false declaration counts may not be imposed under the factual circumstances here present.

## C. THE SUFFICIENCY OF THE EVIDENCE ON IGNACIO'S CONVICTIONS

### (1) *The False Declaration Counts*

■ Appellant Ignacio contends there was insufficient evidence to support his conviction on the Eighth and Ninth Counts alleging false declarations. The evidence on the Eighth Count is alleged to not support the allegation that he lied when he told the grand jury that he had not heard Letelier's name until he heard it in the news a couple of days after the murder or that he lied when he said that his personal opinion was that the Cuban Communists possibly had committed the murder to create problems. There was uncontradicted testimony, however, that Ignacio heard Letelier's name on the day of the murder (Tr. 1695) and that Townley at that time explained to him how Letelier had been assassinated. When such evidence is viewed in the light most favorable to the jury's conclusion, as it must be, the evidence is sufficient to support the charge.

■ A similar claim is made with respect to the evidence introduced in support of the Ninth Count which charged that Ignacio testified falsely when he testified before the grand jury and *denied* that he knew anyone in DINA. In this contention Ignacio asserts that the Government should have been more specific in framing the question. However, it was within the province of the jury to decide the construction given the question by the defendant and determine whether the answer was false. *United States v. Chapin*, 515 F.2d 1274 (D.C.Cir. 1974), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *United States v. Bonacorsa*, 528 F.2d 1218 (2d Cir. 1976), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976).

■ Ignacio also contends that the Government failed to prove the falsity of his statement that he had no contact with anyone who had been in Chile in the past two years. This allegation is sufficiently supported by the circumstantial evidence of Ignacio's contacts with Townley, who used the alias of "Andres Wilson", and Ignacio at the time of his arrest had an address book in his possession containing the name "Andres Wilson" and Townley's ("Wilson's") home telephone number in Chile before 1977. The transcript also contains sufficient evidence of the requisite criminal intent.

We thus find no merit in Ignacio's attack on the sufficiency of the evidence to support the convictions on the two false declaration counts.

### (2) *The Misprision Count*

■ The contention is also made by Ignacio that there was not sufficient evidence to support his conviction of misprision as proscribed by 18 U.S.C. § 4. However, the

evidence indicated that Ignacio on October 21, 1976, a month· after the murders and after Townley had told him how the murders were committed, concealed his knowledge of the assassination and murders when he was interviewed by a Special Agent of the FBI. And given his prior knowledge, his testimony before the grand jury, in which he denied knowledge of the murders, was also sufficient to support the misprision count. *See* Part II–C(1) *supra.* The jury could also interpret Ignacio's obtainment of false identity documentation from Canete for Guillermo as an affirmative act to help Guillermo conceal his identity and flee to foreign nations to escape arrest for his participation in the murders and conspiracy. This was important evidence in support of the misprision charge. The necessary intent to support proof of the crime was also proved by substantial evidence.

## D. MOTION FOR RELEASE ON BAIL PENDING APPEAL

Counsel for Ignacio has renewed his motion in this court for bail pending appeal. In view of the result we have reached with respect to his case, and the fact that he was released on bail prior to trial, we grant his present motion. However, we refer the question as to the amount of the bond to the trial court in view of its familiarity with the relevant facts. The trial court shall likewise have authority to deal with all subsequent motions that may arise in connection with Ignacio's release from custody.

## III

## LIMITATION OF CROSS–EXAMINATION AS TO TOWNLEY'S ALLEGED PARTICIPATION IN OTHER CRIMES

Counsel for appellants Ross and Guillermo Novo sought to cross–examine Townley about his alleged participation to the assassination of Carlos Prats and the attempt to assassinate Bernardo Leighton. Prats and Leighton were Chilean exiles who, like Letelier, opposed the regime which replaced the Allende government.

In September 1974, Prats and his wife were killed in Argentina when a bomb attached to their car exploded after being activated by remote control. Defense counsel proffered to the trial court that Townley had admitted his responsibility for the Prats murder to one of the defendants, and that counsel could present documentary proof that Townley was in Argentina at the time of the killing.

In the second incident, Leighton and his wife were hit by machine gun fire in Rome, Italy in 1975. The defense informed the trial court that it could demonstrate that Townley was somewhere in Europe when the Leighton attack took place.

 The trial court refused to permit inquiry into Townley's role in the Prats and Leighton incidents. Appellants allege error. They argue first that evidence of these crimes was admissible to show that Townley employed a modus operandi which was characterized by the absence of assistance from the CNM. From this, they argue, the jury could infer that Townley did not seek aid from appellants when he plotted the assassination of Letelier. Second, appellants claim that by precluding inquiry into the incidents in Argentina and Italy the trial court wrongfully prevented appellants from exploring one of the major benefits Townley reaped from his plea agreement, namely his right to withhold information about his crimes on foreign soil which did not involve United States citizens.[21]

---

**21.** We may briefly address two other issues raised in the briefs. First, appellants suggested at trial that the Prats and Leighton incidents constituted prior conduct relevant to Townley's credibility under Rule 608(b) of the Federal Rules of Evidence. The trial court rejected this argument, observing that there was already enough evidence before the jury to show that Townley was "not the person that you would want to sit next to at a Sunday worship service." (Tr. 1813.) Appellants have not pressed this argument on appeal, although they do state that Townley's other alleged crimes were relevant to his "motive to testify falsely." Brief of Appellants Ross and Guillermo Novo at 40, 52.

## A. THE MODUS OPERANDI THEORY

The Federal Rules of Evidence authorize the admission of testimony concerning other crimes, wrongs, or acts of a person for such purposes as proof of motive or plan. Such evidence is inadmissible, however, to prove the character of a person in order to show that the person acted in conformity therewith. Fed.R.Evid. 404(b).[22] Even if admissible, evidence of other crimes or wrongs may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or needless accumulation of evidence. Fed.R.Evid. 403; *United States v. Burkley*, 591 F.2d 903, 919 (D.C. Cir. 1978), *cert. denied* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782.

Appellants sought to explore the crimes in Argentina and Italy in order to demonstrate that Townley typically carried out his DINA assignments by working alone or in conjunction with Virgilio Paz (an indicted fugitive) and not with appellants. They argue that the jury could infer that Townley neither needed nor sought cooperation from the appellants when he planned the assassination of Letelier. This evidence would have been especially probative, they allege, because it was undisputed that Guillermo Novo and Ross were not in Washington when the blast occurred and in fact played no part in the construction of the bomb. By showing that Townley normally operated without their help, appellants could fortify their primary defense that they were not involved in the Letelier murder.

We reject the argument. Preliminarily, we note that the trial judge was validly concerned about the factual proffer by the defense. The alleged link between Townley and the Prats killing was based only on (1) a self-serving statement by one of the defendants (who, of course, had the right not to take the witness stand) that Townley had admitted responsibility for the death; (2) proof that Townley was in Argentina at the time of the murder; and (3) some similarity in the methods by which Letelier and Prats were killed. The proffer connecting Townley to the Leighton attack was even more tenuous in that appellants would have been able to show only that Townley was some-

In any event, we concur with the trial court's finding that this evidence was not admissible under Rule 608(b). Aside from the tenuous link between the alleged crimes and Townley's capacity for truthfulness, *see United States v. Young*, 567 F.2d 799, 803 (8th Cir. 1977), *cert. denied* 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 786, such evidence would have been purely cumulative in that Townley had admitted planning the murders of Letelier and two other Chilean exiles. *See United States v. Newman*, 490 F.2d 139, 145 (3rd Cir. 1974) (additional evidence impugning witness's credibility would have been cumulative where it was already evident that witness was unsavory and untrustworthy).

Second, appellants assert in their brief that the incidents in Argentina and Italy were admissible as evidence of habit under Rule 406. This argument is patently without merit. Contrasting habit evidence with character evidence, McCormick describes the former as [a] person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

McCormick, Evidence § 162, p. 341 (1954). It is the "semi–automatic" character of the behavior which renders habit evidence trustworthy. In *Levin v. United States*, 338 F.2d 265 (D.C. Cir. 1965), decided before the enactment of Rule 406, this court upheld the exclusion of the defendant's habit of staying home on the Sabbath, noting that "the very volitional basis of the activity raises serious questions as to its invariable nature, and hence its probative value." 338 F.2d at 272. To those of us unfamiliar with the violent side of international intelligence operations, the actions of Townley would appear ruthless. But to say that he made a "habit" of assassinating Chilean exiles is to stretch both the English language and the law. There is no basis for admitting the evidence under Rule 406.

**22.** The text of Rule 404(b) is as follows:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

where in Europe when the attempt to murder the Chilean exile was staged in a manner entirely different from the method of assassination in this case.

It is true, of course, that defense counsel need not proffer a factual foundation for all questions asked on cross-examination. A well reasoned suspicion that a circumstance is true is sufficient. *United States v. Fowler*, 465 F.2d 664, 666 (D.C. Cir. 1972); *United States v. Pugh*, 436 F.2d 222, 225 (D.C. Cir. 1970). On the other hand, counsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel. *United States v. Fowler, supra*, at 666. The general rule in such situations is that "the questioner must be in possession of some facts which support a genuine belief that the witness committed the offense or the degrading act to which the questioning relates." *Id.*

When we consider appellant's proffer in light of the extremely limited relevance of the evidence, we must uphold the exclusion of the testimony. The Prats assassination was clearly irrelevant because Townley did not even meet any members of the CNM until several months after that incident. Proof that appellants had not assisted Townley in a venture which took place before Townley and appellants had ever met would hardly bolster their claim that they took no part in the subsequent scheme to murder Letelier.

Evidence concerning the Leighton attack was equally irrelevant since the manner of the attempted execution bore no resemblance whatever to Letelier's murder and the incident could have shed no light on the degree to which appellants participated or did not participate in the Letelier bombing. Moreover, since the government never asserted that the CNM was necessary to the completion of Townley's mission—only that it was advantageous for DINA to use CNM members for certain projects—the Prats and Leighton incidents were not admissible to show that the CNM was not an indispensable part of DINA operations. Accordingly, this testimony could be valuable to appellants only if it functioned as character evidence by suggesting that appellants' nonparticipation in possible other assassinations made their involvement in the Letelier bombing less likely. But the Federal Rules of Evidence expressly prohibit the admission of evidence of other acts for this purpose. *See* Fed.R.Evid. 404(b).

Appellants claim, however, that the government opened the door to inquiry into the attacks in Argentina and Italy when the prosecutor examined Townley about an unsuccessful venture in Mexico in 1975. At the command of DINA, Townley had traveled to the United States, contacted members of the CNM, and requested their assistance for a DINA mission in Mexico City. His assignment was to disrupt a meeting of Chilean exiles being held in Mexico City and to "eliminate" two leaders expected to attend. After meeting Guillermo Novo, Townley acquired explosives, blasting caps, and detonating cord from the CNM for use in his mission. CNM member Virgilio Paz accompanied Townley and his wife to Mexico City, but they arrived too late for Townley to carry out his assignment. Citing Fed.R.Evid. 611(b), which authorizes cross-examination on the subject matter of direct examination, appellants argue that once the government introduced its evidence on the Mexico project, testimony about other assassination attempts should have been permitted.

Appellants' comparison between the aborted mission to Mexico and the Prats and Leighton incidents is misleading. Townley's description of the role of the CNM in the Mexico assignment was directly relevant to the conspiracy to assassinate Letelier. His testimony illustrated why DINA solicited the help of the Cuban group, and showed how the relationship between Townley and the CNM began and matured. Novo had cooperated with Townley after verifying that he was a DINA agent, thus setting the stage for continued communication and cooperation when mutually advantageous. Townley showed Paz a remote

control paging device which was similar to the type used to detonate the bomb attached to Letelier's car. The loan of explosives for the Mexico assignment was part of a pattern which surfaced again during preparation for the subsequent murder. The complicity of CNM members in the Mexico mission provided evidence of their motive for cooperating in the Letelier assassination.

 In short, Townley's testimony about the Mexican mission constituted proof of intent, plan, preparation, and motive, which is admissible under Rule 404(b).[23] The testimony was not offered to show that Townley always acted in conjunction with appellants or that appellants were indispensable to the accomplishment of the Letelier assignment. Rather, the government's theory was that DINA used the CNM for selected missions in order to place as much distance as possible between DINA and its projects abroad. Appellants, on the other hand, would not have been able to establish the relevance of the Prats and Leighton incidents even if Townley had been responsible for both of those attacks.[24]

Appellants cite *United States v. Newman*, 490 F.2d 139 (3rd Cir. 1974), in support of their argument. In *Newman*, defendant Gaca had been found guilty of willfully intercepting, endeavoring to intercept and procuring another to intercept a wire or oral communication in violation of 18 U.S.C. § 2511(1)(a) and 18 U.S.C. § 2. The government's evidence showed that Gaca and Nee, a codefendant who testified for the government, were partners in the operation of a general wiretap business. In order to show that Gaca did not participate in all wiretappings performed by Nee, Gaca's counsel asked Nee about other wiretaps which he had set while acting alone, but Nee asserted his Fifth Amendment privilege against self-incrimination. Under these circumstances, the court held that the failure to order a partial striking of Nee's testimony regarding the wiretap partnership was error.

*Newman* does not persuade us that cross-examination into the Prats and Leighton incidents should have been permitted in this case. First, the central element of the government's case in *Newman* was the ongoing partnership arrangement between Nee and Gaca; the evidence strongly implied that if Nee had participated in a wiretap, his partner Gaca would also have participated. 490 F.2d at 145–46. Here, however, the government did not contend that Townley and the CNM formed a general partnership for the commission of numerous assassinations or that Townley always relied on CNM to carry out his assignments. Rather, DINA instructed Townley to use CNM on specific missions where that organization might prove useful. One could not

---

**23.** Such evidence is particularly probative where the government has alleged conspiracy. *See United States v. Dansker*, 537 F.2d 40, 57–58 (3rd Cir. 1976), *cert. denied* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (conspiracy to violate Travel Act, 18 U.S.C. § 1952; evidence of previous embezzlements by defendants was admissible to show the relationship between the government's primary witness and the defendants modus operandi, and defendants' motive); *United States v. Smith*, 504 F.2d 560, 561 (5th Cir. 1974) (conspiracy to distribute heroin; testimony about heroin purchases during and prior to period of conspiracy was admissible as proof of plan or method of operation); *United States v. Nakaladski*, 481 F.2d 289, 296–97 (5th Cir. 1973), *cert. denied* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (extortion conspiracy; testimony about criminal transactions outside the time period of the indictment showed motive and intent, modus operandi, the existence of a general conspiracy, and the relationship among the conspirators); *United States v. Parker*, 469 F.2d 884, 889–90 (10th Cir. 1972) (conspiracy to defraud the United States by making firearms; evidence regarding construction of other bombs showed common scheme or plan and absence of mistake).

**24.** In their discussion of Rule 404(b), appellants claim that the Prats and Leighton incidents were relevant to Townley's motive to testify falsely, implying that this is the type of "motive" which could be proved by evidence of other crimes under Rule 404(b). The witness's *motive to testify falsely, however, is merely an* aspect of credibility. The principles controlling the admission of evidence of conduct probative of credibility are set forth in Rule 608. *See* note 21 *supra*. "Motive" in the context of Rule 404(b) refers to the motive for the commission of the crime charged.

reasonably infer from the sole fact that Townley had participated in a given project that the CNM had also been involved.[25] Second, whether Nee had actually set the prior wiretaps was not an issue in *Newman*; here, the evidence linking Townley to the attacks in Argentina and Italy was at best speculative.

## B. THE PLEA AGREEMENT

The second theory offered by appellants to justify cross–examination on Townley's participation in the Prats and Leighton incidents stems from the plea agreement between Townley and the government. Under that agreement, no obligation was imposed on Townley to reveal his responsibility, if any, for crimes which were beyond the jurisdiction of this country and which did not affect our citizens. At trial, defense counsel cross–examined Townley extensively about his bargain with the government, and elicited the fact that he was free to withhold information about his foreign activities. Townley told the jury that but for this provision he would not have signed the agreement, because he planned eventually to return to Chile and feared prosecution in that country if he were compelled to make disclosures to U.S. officials. As noted, the trial judge barred the defense from asking Townley about the details of his foreign activities. Appellants allege error, contending that this restriction prevented them from revealing to the jury the extent of the benefits Townley gained from his bargain with the government.

■ We reject the theory. A defendant, of course, has the right to cross–examine a witness to ferret out any promises of leniency he may have received in return for testifying, *see United States v. Leonard*, 494 F.2d 955, 963 (D.C.Cir.1974), especially when the person is an admitted accomplice and a star witness, *United States v. Barrentine*, 591 F.2d 1069, 1081 (5th Cir. 1979), *cert. denied*, 444 U.S. 991, 100 S.Ct. 521, 62 L.Ed.2d 419. But here, the jury was fully aware that the plea agreement permitted Townley to hide the details of his participation in crimes on foreign soil, and that this provision was critically important because it shielded Townley from prosecution in Chile.[26] Furthermore, it is somewhat misleading to characterize the provision on Townley's foreign activities as a benefit conferred by the government. Because the government generally would have had no jurisdiction to investigate Townley's alleged criminal activity around the world, it gave up nothing by declining to seek information about such activities.[27] Under appellants' theory, anything not demanded by the government would become a benefit of the plea agreement worthy of exploration before the jury. Such an interpretation would carry the defendant's right to cross–

25. To the extent that *Newman* might be read to stand for the broader proposition that whenever the government seeks to show cooperation among defendants, inquiry into instances of noncooperation–no matter how remote–is mandatory, we decline to follow that decision.

26. The following excerpts from the trial transcript are illustrative (Tr. 2035–36, 2041):

Q You told the Government, through your attorney, did you not, Mr. Townley, that you would not–not disclose any information about any other activities that you had done?
A Because it would leave me open for prosecution in Chile immediately.
Q Prosecution in Chile and perhaps prosecution in other foreign jurisdictions, isn't that correct?
A I have no idea, sir.

 * * * * * *

Q What I am asking, Mr. Townley, is it true, sir, that it was made quite clear that you would not discuss things outside of the United States other than what you have testified to here in court?
A Yes, that's correct.
Again, for the simple reason of prosecution in Chile which I consider my home, to which I return.

27. There was a colloquy at trial about whether Townley would have been able to assert a Fifth Amendment privilege in response to questions which might have subjected him to prosecution in a foreign country. The Supreme Court has yet to decide whether such a privilege exists. *See Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 478–81, 92 S.Ct. 1670, 1674, 32 L.Ed.2d 234 (1972). Because the evidence of the Prats and Leighton attacks was properly excluded on relevance grounds, we have no occasion to address this issue.

examine prosecution witnesses to an unacceptable extreme.

In summary, because the evidence tying Townley to the Prats and Leighton incidents amounted to mere speculation, because those incidents were irrelevant to the issues in this case, and because cross-examination in this area was not necessary to highlight the benefits Townley gained from the deal he struck with the government, we find that the trial judge properly exercised his discretion when he refused to permit defense counsel to probe Townley's alleged participation in the other attacks.

## IV

### CROSS–EXAMINATION OF TOWNLEY ABOUT HIS ROLE IN DINA

One of the major defenses in the case was that the CIA, not DINA, had formulated the plan to assassinate Letelier. In this connection, appellants sought to prove that Townley was not a loyal agent of DINA but a CIA operative. They claim that the trial court thwarted their efforts to develop this theory by upholding Townley's repeated assertion of a Fifth Amendment privilege in response to questions about the internal operations of DINA.

An examination of the trial transcript indicates that appellants overstate Townley's reluctance to answer questions on Fifth Amendment grounds. Townley asked to speak to his attorney on only five occasions during several days of intensive cross-examination. The first instance occurred when the witness was being questioned on voir dire about an unsigned and unauthenticated statement he had allegedly made to General Orozco, a Chilean investigator, in Chile on March 29, 1978 (Tr. 1844). The statement had been forwarded to defense counsel by Sergio Miranda Carrington (Miranda), the Chilean attorney for the defendant Juan Manuel Contreras. Townley denied that the statement was his and declined to answer a question about it. The court deferred its ruling until an English translation of the statement could be obtained. At a later point, the defense received a written statement that bore Townley's signature and that had been made to Orozco under oath on March 29, 1978. Appellants then cross–examined Townley exhaustively on that statement and elicited the admission that he had lied when he made it.

The second occasion on which Townley invoked a Fifth Amendment privilege occurred when the defense asked him to reveal the source of the electric matches used in the bomb assembly (Tr. 1887). Because of the nature of his work and the fact that he might incur liability in Chile by answering, Townley declined to respond. The trial judge first ruled that the privilege could be used to shield the source of the electric matches (Tr. 1956–57). However, after discussing the matter with his attorney, Townley relinquished his claim to the privilege and testified that he had received the matches from a person named Ernesto who was in charge of DINA's Section of Disarming or Handling Explosive Devices. Thus, despite his initial hesitation, Townley eventually answered the question fully.

The next time Townley asked to consult his attorney was when the defense asked whether he had stated to Orozco that he had a dual role in DINA as an informant and a technical consultant (Tr. 2064). The judge was concerned that the cross–examination would spill over into irrelevant matters, and he restricted questioning to areas pertinent to the Letelier mission. The court, however, ordered Townley to answer the question that had been propounded, and the witness did so.

Townley invoked his privilege again when counsel inquired about his alleged missions to Europe with Virgil Paz in 1975 (Tr. 2177). The judge had previously ruled that this area was an improper area of cross–examination,[28] and he upheld Townley's refusal to answer.

Finally, Townley asked to speak to counsel after the appellants inquired about a remote control system which could activate explosives from a distance (Tr. 2192–93). Townley answered the question, after consultation.

**28.** *See* Part III *supra.*

In short, the record does not support the claim that appellants were unable to probe Townley's lack of involvement with DINA because of his assertion of a Fifth Amendment privilege. Townley displayed an initial reluctance to answer on only five occasions during cross–examination. He ultimately answered all of those questions except one which the trial court had previously disallowed.

## V

### TOWNLEY'S TELEPHONE CALL TO ETCHEPARE

■ In the final week of trial, after the direct and cross–examination of Townley had been completed, defense counsel informed the trial judge that they had come into possession of a tape recording of a telephone call which Townley had purportedly made to one Gustavo Etchepare in Chile. Counsel reported to the court that the conversation was in Spanish and that the call had originated from the office of the United States Attorney in Washington, D. C. on January 30, 1979, during the third week of trial. The defense prepared an English transcript of the dialogue between Etchepare and Townley.[29] During that conversation, according to the defense transcript, Townley disparaged the judge and jury; he said that he would solicit friends to threaten the trial judge in order to compel the judge's withdrawal from the case; and he made numerous references to unidentified persons who theoretically might somehow be implicated in the Letelier incident.

In a voir dire outside the presence of the jury, Townley admitted that he had placed a call to Etchepare in Chile (Tr. 5073). The defense then sought to recall Townley to examine him about the conversation, but the trial judge refused to permit any inquiry into the call before the jury. Appellants challenge this ruling, contending that the telephone conversation was relevant both to the factual issues in the case and to Townley's credibility.

We hold that the trial court erred when it denied appellants an opportunity to examine Townley about the telephone call that he had admittedly placed. Counsel had a reasonable basis for believing that Townley had made statements during that conversation which affected his credibility and which might have led to the discovery of exculpatory evidence. *United States v. Fowler, supra; United States v. Pugh, supra.* Because the court barred all inquiry into the call, we have no way of knowing what an examination of Townley in this area would have revealed. At the retrial, appellants should be permitted to use the defense transcript in order to refresh the recollection of the witness or to impeach him or for any other proper purpose. Townley will be free to admit or deny that he made particular statements to Etchepare, and he will be able to offer such explanation as may be appropriate. It does not follow, however, that the tape or the defense transcript of it should be admitted into evidence and published to the jury unless and until the court determines that the exhibits are properly authenticated and otherwise meet the tests of admissibility. In the event that these items are offered into evidence, the government will be allowed to challenge their admissibility.[30]

## VI

### EVIDENCE OF THE ALLEGED PARTICIPATION OF THE CIA IN THE LETELIER ASSASSINATION

■ In their opening arguments, counsel for appellants informed the jury that

**29.** Supplemental Appendix for Appellants Guillermo Novo Sampol and Alvin Ross Diaz at 1–5.

**30.** In this regard, we note that after the verdict in this case had been rendered, the Federal Bureau of Investigation conducted a laboratory analysis which indicated that there had been some tampering with the tape. The government also obtained an affidavit from Etchepare in which he denied that he had ever recorded a conversation with Townley. Because judgment had been entered in the case, these materials did not become part of the record on appeal. At the retrial, the government may utilize these materials as a basis for objecting to the admission of the tape or the transcript.

the evidence would show that it had been the CIA, not DINA or the Chilean government, which had masterminded the assassination of Letelier. Appellants claim that the trial judge stymied their efforts to develop this defense [31] by issuing a blanket restriction forbidding the cross–examination of government witnesses about the possible complicity of the CIA. They contend that they presented a solid factual basis for pursuing this line of inquiry, and that even if no such foundation existed they were entitled to undertake exploratory questioning.

■ Neither the record nor the law supports these claims. Contrary to appellants' assertion, the court made no blanket ruling but rather weighed the propriety of questions about the role of the CIA in the context of the cross–examination of particular government witnesses. For example, when counsel for appellants tried to ask Michael Moffitt whether Letelier had ever discussed CIA participation in the ouster of Salvador Allende, the court properly sustained an objection. Because Moffitt's direct examination concerned only his personal background, that of his wife, and the events immediately preceding the explosion, the question was clearly beyond the scope of his earlier testimony. The court indicated that appellants were free to recall Moffitt if they wished to inquire into other areas, and the government agreed to keep the witness available (Tr. 1263).

The topic of the CIA arose again during the examination of Senator George McGovern. On direct, the government asked McGovern whether Letelier had said any-

thing about the CIA during two particular conversations as to which the Senator had testified. McGovern replied that to his recollection Letelier had not mentioned that organization (Tr. 1348). On cross–examination, defense counsel asked McGovern two questions about whether Letelier had ever referred to the involvement of the CIA in the ouster of Allende in 1973, and McGovern responded in the negative (Tr. 1353–54). Defense counsel informed the court that they had probed no further into the possibility of CIA connivance because of the court's earlier ruling restricting cross–examination to matters within the scope of direct. The court agreed with the government that any question to McGovern about the role of the CIA which did not relate to his conversations with Letelier would have been outside the scope of his earlier testimony (Tr. 1359–60).

Finally, appellants sought to elicit from Mrs. Letelier the fact that she had suspected that the CIA had tampered with her mail before her husband was killed. This, appellants argued, would have helped to prove that the CIA had a motive to plan the murder. The trial judge barred the testimony (Tr. 1558–61). The defense later called Mrs. Letelier and examined her thoroughly about the interference with her mail (Tr. 4634–54).

■ The trial court has discretion to require that an affirmative defense be presented through defense witnesses in order to ensure that the trial proceeds in an orderly fashion. In *United States v. Stamp*, 458 F.2d 759 (D.C.Cir.1971), *cert. denied*, 406

---

**31.** Appellants have never stated with particularity the theory of this "defense." To the extent that Ross and Guillermo Novo actually conspired with Townley to assassinate Letelier, the fact that Townley may have been working for the CIA rather than DINA, or as a double agent for both organizations, appears immaterial. Evidence of CIA involvement might have provided ammunition for the impeachment of government witnesses who had attributed the crime to DINA, and it might have diluted the government's attempt to assign a motive to DINA, but it would not have created a *defense* if appellants' participation in the crimes had been established beyond a reasonable doubt.

In light of its dubious probative value, when the testimony began to stray too far afield, the trial judge properly refused to allow appellants to "put the CIA on trial in this case" (Tr. 5019).

For the purposes of addressing the specific points raised by appellants, however, we shall assume that they had a valid interest in producing evidence of CIA complicity and that such evidence might loosely be dubbed an "affirmative defense." The question then becomes whether the trial judge correctly controlled the order of proof by requiring, in general, that appellants present such evidence through their own witnesses.

U.S. 975, 92 S.Ct. 2424, 32 L.Ed.2d 675 the defendants had been charged with conspiracy, obtaining property by false pretenses, and forgery. On cross–examination, defense counsel sought information about the financial statements of one of the defendants, but the trial judge precluded further inquiry because the questions were beyond the scope of direct examination. The trial court, however, informed counsel that the witness could be recalled during the presentation of the defense's case. The ruling was upheld on appeal:

> It must be remembered that it is the trial judge's duty to see that the evidence is presented to the jury in as orderly and intelligible a manner as possible. To accomplish these ends the trial judge in limiting cross–examination must necessarily be entrusted with a great degree of discretion. [Citations omitted.] The court here was quite correct in not allowing the defense to cross–examine Harrison with respect to matters only relative to an affirmative defense and not brought into the case on direct.

458 F.2d at 773.

In *Baker v. United States*, 401 F.2d 958 (D.C.Cir.1968), *cert. denied* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384, the defendant was charged with income tax evasion stemming from his failure to report funds which he was to devote to the political campaigns of certain congressmen. His defense was that he had given the funds to a senator to forward to the congressmen. The court upheld the trial court's refusal to allow the presentation of this defense through the cross–examination of the congressmen:

> The trial judge is necessarily entrusted with a large measure of discretion to control the introduction of evidence and to assure that it is logically and understandably presented to the jury, and we are not persuaded that that discretion was abused here. The court quite reasonably refused to permit the defendant to question witnesses about a matter relevant only to an affirmative defense which the defendant had not yet brought into the case by his own testimony.

401 F.2d at 987 (footnotes omitted).

■ Here, the record establishes that any questions as to the general activities of the CIA in Chile would have exceeded the scope of the direct examination of Moffitt, McGovern and Mrs. Letelier.[32] Since the stated purpose of such testimony was to establish what counsel considered to be an affirmative defense, the trial judge was free to demand that appellants call their own witnesses to present it. Appellants claim that the availability of the government witnesses for recall did not mitigate the error, because without an immediate opportunity to rebut there was no chance to correct the impression that had been made upon the jury. We note, however, that this court in *Baker* specifically rejected such a theory where the testimony does not touch upon matters raised on direct but instead pertains solely to an affirmative defense. In the instant case, there was simply nothing to rebut. One cannot "strike while the iron is hot" if the flame has never been set.

The cases cited by appellants are not persuasive. In *United States v. Miranda*, 510 F.2d 385 (9th Cir. 1975), the defendant had been convicted of embezzling federally insured funds. Relying on relevance grounds, the trial court excluded testimony by the defendant's supervisor regarding which employees beside the defendant had access to the cabinet where the funds were kept. A major element of the government's case was the defendant's opportunity to steal the funds, and the prosecution had called other employees who had denied the theft. Under these circumstances, and because the trial court had also committed a serious error on another issue, the court overturned the conviction. In this case, on the other hand, the government's case did not consist solely of circumstantial evidence, but also included direct testimony inculpating appellants. Moreover, the trial judge did not

---

**32.** *See* Fed.R.Evid. 611(b), which undermines appellants' argument that they "had a constitutional right to cross–examine the government's witnesses on *all* issues relevant to the trial." Brief for Appellants Guillermo Novo and Ross at 67 (emphasis added).

exclude the evidence entirely, but merely insisted that the defense introduce its proof of CIA participation by recalling witnesses who were freely available.

Other cases cited by appellants stand for the well established but immaterial proposition that the introduction of hearsay testimony, in the form of diagnostic medical reports or other out–of–court statements, unacceptably impairs the critical right to cross–examine the declarant. *See New York Life Ins. Co. v. Taylor*, 147 F.2d 297 (D.C.Cir.1945) (hospital records containing a psychiatric diagnosis of the insured's psychoneurotic state); *Lyles v. United States*, 254 F.2d 725 (D.C.Cir.1957), *cert. denied* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (written opinion of psychiatrist); *Phillips v. Neil*, 452 F.2d 337 (6th Cir. 1971), *cert. denied* 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (medical reports by unidentified authors); *United States v. Check*, 582 F.2d 668 (2d Cir. 1978) (informer's statements to undercover police officer).

Appellants claim that the trial court placed improper restrictions not only on their cross–examination of government witnesses, but also on their direct examination of CIA officials whom they called to testify. They sought to prove through these witnesses that Townley was a CIA agent and that the agency possessed a motive for assassinating Letelier.

*Casey v. United States*, 413 F.2d 1303 (5th Cir. 1969), *cert. denied* 397 U.S. 1029, 90 S.Ct. 1278, 25 L.Ed.2d 540, involved a similar claim of CIA involvement. Defendants, on trial for conspiring to lead a military expedition against a friendly nation and to export arms and munitions, tried to examine witnesses about the alleged participation of the CIA in the events at issue. The trial court ruled that the defendants would not be allowed to ask questions implying CIA complicity without first proffering testimony showing that the agency was actually involved. Counsel was given the choice of either questioning the witness outside the presence of the jury in order to elicit foundational facts, or proffering probative testimony from other witnesses.

The Fifth Circuit Court of Appeals upheld this ruling, having concluded that the solution preserved the defendants' constitutional right to cross–examine, prevented the jury from making unwarranted inferences with no basis in fact, and adequately safeguarded national security. 413 F.2d at 1305.

Although appellants attempt to distinguish *Casey* on the ground that they presented an adequate factual proffer of CIA involvement, the record belies their claim. Primarily, we note that in some instances the CIA witnesses called by the defense lacked personal knowledge about the areas appellants sought to explore. The director of security for the agency testified that he did not know whether any CIA personnel were situated in Chile from 1970 through 1972 because the operations section had not shared that information with him (Tr. 4995). The chief of the group which maintains the files of the Directorate of Operations testified that there were CIA operatives in Chile in 1973, but he did not know whether the agency was active in Chilean politics at that time (Tr. 5024), whether there was a field station in Santiago from 1970 through 1972 (Tr. 5030), or where agents were located (Tr. 5031). To the extent that appellants were unsuccessful in their efforts to prove CIA complicity merely because their witnesses had no personal knowledge of the agency's activities in Chile, they of course have no basis for asserting error.

As a matter of fact, the only testimony even remotely linking the CIA to the events of this case was Townley's discussion of his contacts with the agency in 1970 and 1973. His testimony was corroborated by CIA officials who said that in 1971, according to their records, the agency had approved Townley for assessment for possible future use, but later cancelled the authority to contact him. When Townley approached the agency in 1973, the CIA was not interested in his services. Appellants thoroughly explored the contacts between Townley and the CIA in their direct examination of CIA officials and cross–examination of

Townley. Although they allege that the court and the government improperly curtailed their examination on legitimate issues, their references to the trial transcript indicate to the contrary that the judge merely kept testimony within the boundaries of relevance.[33] Evidence of CIA activity which did not pertain to the agency's contacts with Townley, or more importantly, to appellants' guilt or innocence, was wholly immaterial. The trial judge committed no error by excluding it.

## VII

### CROSS–EXAMINATION OF RICARDO CANETE

Ricardo Canete, a government witness, testified that appellant Ross had admitted his complicity in the assassination of Letelier and that Canete had provided Ross with false identification papers. Appellants challenge the trial court's refusal to permit counsel for Ignacio Novo to cross–examine Canete about his religious beliefs and his alleged addiction to narcotics.

### A. CANETE'S RELIGION

 Counsel for Ignacio Novo proffered to the trial court that Canete had discussed with his client his devotion to the Luceme religion. On voir dire, Canete testified that he faithfully adhered to the teachings of that sect and consulted with spirits of his religion before taking certain actions. He had no religious beliefs which would cause him to violate his oath to testify truthfully. The trial judge cut off further inquiry into Canete's religious practices at that point.

**33.** *See* Tr. 4721–22 (government would object to any testimony regarding a specific mission in Paraguay, general practices of the CIA, the location and identity of their agents, and matters not relating to Townley); 4741 (CIA would not confirm its presence in an embassy); 4740, 4979 (prohibiting questions about the number of CIA agents in Chile).

**34.** Fed.R.Evid. 610:

Evidence of the beliefs or opinions of a witness on matters of religion is not admissi-

The government correctly points out that the court's exclusion of this evidence was not only justified but required by the Federal Rules of Evidence. Rule 610 bars the admission of evidence of the religious beliefs of a witness for the purpose of showing that his credibility is impaired as a result of those beliefs.[34] The purpose of the rule is to guard against the prejudice which may result from disclosure of a witness's faith. The scope of the prohibition includes unconventional or unusual religions. *See Government of Virgin Islands v. Petersen*, 553 F.2d 324 (3rd Cir. 1977) (defense counsel could not elicit testimony that alibi witness was a member of the Rastafarian sect).[35] The fact that Canete professed adherence to a religion which is not commonly shared does not prevent the application of the rule. The trial judge committed no abuse of discretion.

### B. CANETE'S ALLEGED DRUG ADDICTION

 Counsel for Ignacio Novo informed the trial court that Canete's father had said that the witness was addicted to drugs. Counsel had previously told the court that Canete's father considered his son to be mentally incompetent and that Canete had alienated his entire family by his persistent involvement in legal troubles. Without conducting a hearing, the judge barred all inquiry into Canete's drug use.

We have recognized that it is proper to explore the drug addiction of a witness in order to attack his credibility and capacity to observe the events in question. *United States v. Leonard, supra*, 494 F.2d at 971. In *United States v. Fowler, supra*, this court held that defense counsel had a right to cross–examine the government's princi-

ble for the purpose of showing that by reason of their nature his credibility is impaired or enhanced.

**35.** *See also* McCormick, Evidence § 48 (1954) ("the disclosure of atheism or agnosticism, or of affiliation with some strange or unpopular sect, will often in many communities be fraught with intense prejudice."); 3A Wigmore, Evidence § 936 (Chadbourn Rev. 1970).

pal witness, a former undercover narcotics agent, where the agent had taken a urine test showing signs of possible narcotics use and had been dismissed by the Police Department shortly thereafter. And in *Wilson v. United States*, 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728 (1914), the Supreme Court ruled that the trial court had improperly denied cross–examination of an admitted drug user to determine whether her powers of recollection had been impaired.

Although the narcotics addiction of a witness is relevant to his capacity to observe, a trial judge must deal with an allegation of drug use with some sensitivity because of the highly inflammatory nature of such a charge. The possibility that exploration of a witness's addiction will generate unwarranted prejudice demands that the judge exercise discretion to keep the scope of such examination within proper bounds. *See United States v. Fowler, supra*, 465 F.2d at 668; *United States v. Kearney*, 420 F.2d 170, 174 (D.C.Cir.1969). Accordingly, before the court will permit a witness to be questioned before the jury about his use of narcotics, counsel must establish a foundation showing either that the witness was using drugs at the time he observed the events in dispute, *United States v. Leonard, supra*, 494 F.2d at 971; *United States v. Fowler, supra*, 465 F.2d at 667, or that he is under the influence of narcotics while testifying, *United States v. Banks*, 520 F.2d 627, 631 (7th Cir. 1975). Thus in the *Leonard* case we upheld a ruling by the trial court foreclosing any further inquiry into a witness's drug use after he testified that he had taken drugs neither on the day he observed the crime nor during the previous several months.

■ Applying these principles to the facts in this case, we discern no error in the trial court's ruling. To justify exploration of this particularly sensitive area, defense counsel proffered only that the witness's father, who openly disapproved of his son, had informed counsel of Canete's addiction to drugs. No offer was made to prove that Canete was influenced by narcotics during his testimony or at the time of the events which were the subject of his testimony.[36] Counsel had previously attempted without success to show that Canete was mentally incompetent and immoral, and his effort to present the witness's unusual religious beliefs to the jury had also failed. Furthermore, the fact that Canete was not the government's principal witness weakens the argument of the appellants. *Cf. United States v. Fowler, supra*.

■ Appellants stress that the judge prohibited any questioning of the witness even outside the presence of the jury, where there would have been no danger of prejudice. It is true that normally the better practice in this situation is to permit counsel to establish a foundation by examining the witness outside the hearing of the jurors. *United States v. Kearney, supra*, 420 F.2d at 174; *see United States v. Leonard, supra*. On the other hand, we by no means favor, and do not intend to establish, a general rule requiring a factual proffer as a precondition for cross–examination into uncharted areas. Defense counsel often cannot foresee what new information a particular line of questioning will divulge, and inquiry is usually permissible when counsel has merely a reasonable basis for suspecting that a circumstance is true.

In this case, however, given the dubious basis of counsel's proffer, the fact that Canete was not the key witness for the government, and the sensitive nature of the subject matter, we cannot say that the trial judge exceeded the boundaries of his discretion. *See United States v. Kizer*, 569 F.2d 504 (9th Cir. 1978), *cert. denied* 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71; *United States v. Banks, supra* ; *United States v. Holt*, 529 F.2d 981 (4th Cir. 1975); *United States v. Davis*, 486 F.2d 725 (7th Cir. 1973),

---

**36.** The colloquy at trial was as follows (Tr. 3514):

 Mr. Suarez: I understand that this man is also drug addicted, and that's from his father.

THE COURT: All right. If the quality of that proffer is no better than the quality of the other proffer, it's denied. Don't go into it.

Mr. Suarez: All right.

*cert. denied* 415 U.S. 979, 94 S.Ct. 1569, 39 L.Ed.2d 876.

## VIII

## THE DEMONSTRATION OF LUIS VEGA'S MISIDENTIFICATION OF ROSS

Luis Vega, a government witness, was the superintendent of a building located at 4523 Bergenline Avenue in Union City, New Jersey. A man known to Vega as Carlos P. Garcia, acting on behalf of the C & P Novelty Company, had rented a room in the building. The space was subsequently abandoned. Thereafter Vega discovered materials in the premises which he turned over to the FBI. The materials were introduced at trial to link appellants to the conspiracy.

■ On direct examination, Vega identified a photograph of appellant Ross to be the man he knew as Garcia (Tr. 3011). After the completion of direct examination, the defense proffered that the real Carlos P. Garcia was present in the courthouse. The defense presented him to Vega outside the presence of the jury, and Vega acknowledged that it was that person, not Ross, who had rented the office for C & P Novelty. The defense then sought to confront Vega with the real Garcia before the jury, but the court ruled that such a procedure could be used only during the defense case and told Garcia to leave the room. When the jury returned, Vega testified that a man he had seen while the jury was absent was definitely the Carlos P. Garcia who had rented the office and that he did not recall if he had seen Ross at 4523 Bergenline Avenue.

The government characterizes the proffer of a physical demonstration of Vega's misidentification as an attempt to introduce an affirmative defense during the government case and asserts that appellants could ad-duce such evidence only during their own case. In support of its theory, the government cites cases which stand for the proposition that the trial court has discretion to refuse to permit the presentation of an affirmative defense through cross-examination of government witnesses. *See United States v. Stamp, supra* (trial court properly cut off inquiry into defendant's wealth and financial statements where these were beyond the scope of direct); *Baker v. United States, supra* (court properly prevented the establishment of affirmative defense to tax evasion through cross-examination of government witnesses).

These cases, however, are inapposite. It is obvious that the sole purpose of the defense tactic was to impeach Vega's direct testimony that Ross was the representative of C & P Novelty who had rented the office. There is no question that the misidentification was comfortably within the scope of direct, and an open target for cross-examination. By ordering Garcia to leave the courtroom, and by restricting the presentation to Vega's sterile admission that in the jury's absence he had identified another man as Garcia, the trial judge robbed the evidence of much of its persuasive power. The jury had no opportunity to compare the real Carlos P. Garcia with appellant Ross, a comparison which was pertinent to the jury's evaluation of Vega's general credibility and powers of recollection. Forced to postpone its demonstration, the defense was deprived of the opportunity to "strike while the iron is hot." *Cf. Baker v. United States, supra.*

But although the ruling by the trial judge was erroneous, we conclude that the error was harmless. Even though the defense could not dramatize Vega's about-face by conducting a demonstration immediately after his testimony on direct, the jury was fully aware that he had changed his story.[37]

37. The examination of Vega in the presence of the jury was as follows (Tr. 3062–64):

> BY MR. DUBIN:
> Q Mr. Vega, this is not the Carlos P. Garcia that you dealt with, is it?

> A Well, right now, you know, for me, no, because right now I remember good, you know, when I see the other guy.
> Q In other words, you saw the real Carlos P. Garcia just this afternoon, isn't that right?
> A The one I know, yes.

Appellants could have recalled Vega to the stand during the presentation of their own case; they could have presented Garcia to the jury and emphasized the misidentification. But appellants chose not to do so. The government presented other evidence which linked Ross to C & P Novelty and to the incriminating items found in the office at 4523 Bergenline Avenue. Under the circumstances, we can say with assurance that the court's error was harmless. *See United States v. Lewis*, 482 F.2d 632 (D.C. Cir. 1973); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 825, 17 L.Ed.2d 705 (1967).

## IX

## OTHER LIMITATIONS ON CROSS-EXAMINATION

Appellants make scattershot references to other instances during the trial where the court allegedly placed improper restrictions on their ability to cross-examine government witnesses. Most require no discussion since (1) they are subsumed in other arguments which we have addressed elsewhere;[38] (2) the areas of inquiry allegedly precluded by the court were fully

Q When the jury was excused you had a chance to see an individual that you recalled being Carlos P. Garcia, is that right?
A Yes, sir.

 \* \* \* \* \* \*

Q And the man that you saw while the jury was out of the courtroom, that was the man that you dealt with, is that right?
A Yes, sir.
Q That is the man who came and rented the apartment, is that correct?
A Yes, sir.
Q And that is the man who paid you the rent, is that right?
Q And that is the man that you gave the key to, is that right? [*sic*]
A Yes, sir.
Q And the man that you saw while the jury was out of the box, that is not this man over here, Alvin Ross, is it?
A No.

**38.** *See* Tr. 1474–84 (cross-examination of Mrs. Letelier as to who had been opening her mail; defense sought to establish that someone else besides DINA may have had a motive to kill her husband) and Part VI *supra*; Tr. 2041 (question as to whether the government had asked Townley about his activities outside the United States) and Part III *supra*; Tr. 2168 (questions about Townley's alleged activities

aired during the trial;[39] or (3) it is patently clear that the claims have no merit. However, several challenges to trial rulings require brief discussion.

## A. JORGE SMITH

■ The court sustained an objection to a question by the defense as to whether Townley knew that Jorge Smith had been subpoenaed to testify (Tr. 2544). Appellants assert that this prevented them from showing that Townley's knowledge of this fact may have been affected his testimony. But as the record reflects, the actual purpose of the question was to let the jury know that the government had subpoenaed Smith and to imply that the prosecution was trying to conceal evidence harmful to its case by declining to call that witness. The court's ruling was entirely justified.

## CROSS–EXAMINATION OF RICARDO CANETE

■ Appellants also challenge five rulings by the trial court during the cross-examination of Canete:

with Virgilio Paz in Europe) and Part III *supra*; Tr. 4721–22 (limitation of examination of CIA witnesses to matters related to Michael Townley) and Part VI *supra*; Tr. 4736 (defense request for CIA records of meetings with Townley) and Part XIII–E *infra*; Tr. 4979 (restriction of testimony on general CIA activity throughout the world) and Part VI *supra*; Tr. 5019 (objection sustained to question about CIA's opposition to Allende regime) and Part VI *supra*; Tr. 5027 (examination of custodian of CIA records) and part VI *supra*.

**39.** *See* Tr. 1474–84 and 4634–55 (examination of Mrs. Letelier about the opening of her mail); 2006 and 2053–54 (discussion of the circumstances under which Townley secured an attorney); Tr. 2188–89 and 2142–51 (cross-examination on whether the government had prepared Townley's testimony); Tr. 2786, 2520–25 and 2588–98 (examination about the discussion between Townley and the court at the time he pleaded guilty). It is unnecessary to address appellants' argument about the limitation of cross-examination as to Sherman Kaminsky because of our disposition of their claim that his testimony should have been excluded entirely. *See* Part I *supra*.

(1) The court sustained an objection when the defense asked the witness whether U.S. Treasury agents involved in his prior counterfeiting case had told Canete that their word usually carried a lot of weight with the sentencing judge (Tr. 3391). Counsel had already extensively explored Canete's motives for cooperating with the government (Tr. 3375–95). There was no error.

(2) The judge barred the defense from asking Canete whether he had reported on his income tax return the money he had received from federal agents (Tr. 3393–94). The judge's action was within his discretion because the topic was of limited relevance and the witness would likely have asserted a Fifth Amendment privilege.

(3) In its direct case, the government had brought out Canete's criminal record, including the dates of his convictions (Tr. 3297–98). Appellants attempted to go beyond the convictions and explore the number of days Canete had spent in jail, the impact of incarceration upon the witness, his probation record, and other collateral matters. The court properly restricted the examination to the convictions and the dates thereof (Tr. 3363–65).[40]

(4) Before cross-examining Canete, defense counsel had listened to a tape recording of a telephone conversation between FBI Agent Larry Wack and Canete. Counsel questioned Canete at length about the call (Tr. 3467, 3474–81). Later in the trial, having discovered what they considered an inconsistent statement in the transcript of the tape, appellants sought to reopen cross-examination on the conversation. The court held the discrepancy to be a minor one and denied permission to reopen examination (Tr. 3565–67). This ruling was not error.

(5) Finally, the trial judge properly excluded irrelevant testimony as to where Canete had obtained his Social Security card (Tr. 3396).

## X

### ADMISSIBILITY OF THE PRIOR CONSISTENT STATEMENT OF MICHAEL TOWNLEY

■ Appellants contend that a prior consistent statement made by Townley on April 17, 1978 was improperly admitted by the court for the purpose of rebutting the charge against him of recent fabrication.

Prior to his extradition from Chile, Michael Townley made two statements in March of 1978 in which he denied responsibility for the assassination of Letelier.[41] Thereafter in April Chilean authorities permitted the extradition of Townley to the United States and F.B.I. agents brought him here and confined him at the Quantico Marine Detention Facility in Quantico, Virginia. (Tr. 2736–37). On April 17 he was visited at Quantico by three members of the Chilean military and intelligence services, General Orozco, Colonel Pantoja, and Major Vergara, who were investigating the assassination. They released Townley from his prior obligation of silence and in a private conversation Townley told General Orozco the same version of the assassination that he would recite at trial. Later that same day, Townley met with United States prosecutors and signed an agreement to testify at trial in return for dismissal of all but one of the possible charges against him.[42] (Tr. 2742–43). Under the agreement if he testified falsely he could be prosecuted for "all

---

**40.** *See United States v. Dow*, 457 F.2d 246, 250 (7th Cir. 1972) ("[A]lthough a defendant who takes the stand may be cross-examined as to his prior convictions to affect his credibility as a witness, the examination should not be conducted in such a fashion as to prejudice the defendant before the jury.... The examination must be limited to whether the defendant had previously been convicted of a felony, to what that felony was and to when the conviction was obtained."); *United States v. Henry*, 528 F.2d 661 (D.C. Cir. 1976); *United States v. Carter*, 482 F.2d 738 (D.C. Cir. 1973).

**41.** Townley made a statement to General Orozco on March 29, 1978 in Chile. (Tr. 2756). He also made a statement denying responsibility for the assassination to the Chilean press in March.

**42.** *See* note 3, *supra* (content of Townley's agreement with the U.S. prosecutors).

of the counts in the indictment and for perjury." (Tr. 2762). The next day, April 18, Townley's statement to General Orozco was reduced to written form and taken back to Chile by the Chilean officers.

At trial, appellants impeached Townley extensively with his prior *inconsistent* statements made in Chile in March of 1978 in which Townley had denied knowledge of the assassination. The government then secured from Chile the statement that Townley had made to General Orozco at Quantico in April, introduced it into evidence as a prior consistent statement, and in a manner that never brought the detailed contents of the statement to the jury's attention, rehabilitated Townley's credibility. Appellants objected to the admission of the statement and renew their objection here.[43]

We uphold the introduction of the April statement to the Chilean officials as a prior consistent statement. While a prior consistent statement is ordinarily inadmissible hearsay, *United States v. Check*, 582 F.2d 668, 680 (2d Cir. 1978), under Federal Rule of Evidence 801(d)(1)(B)[44] it is admissible if the declarant testifies at trial, is subject to cross–examination concerning the statement, and the statement is "consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive ...." Townley's statement satisfies all these requirements of the rule and its admissibility involves determination of a factual question that lies in the sound discretion of the trial court. *United States v. Herring*, 582 F.2d 535, 541 (10th Cir. 1978);

*United States v. Zito*, 467 F.2d 1401, 1404 (2d Cir. 1972).

Appellants contend that the statement made by Townley to General Orozco on April 17 in the United States in which he admitted full participation in organizing the assassination of Letelier, as he testified at trial, should be ruled inadmissible under decisional law because Townley had a *motive* to construct a false story as soon as he was extradited to the United States in early April. Appellants theorize under the case law that Townley had a motive to develop a "self–serving record for use at trial" to gain benefits for himself from the government by establishing a case against the appellants. Relying upon this alleged motive to fabricate, appellants maintain that admission of Townley's statement was inconsistent with the requirement of *Coltrane v. United States*, 418 F.2d 1131, 1140 (D.C. Cir.1969), that a prior consistent statement be "of clear help to the factfinder in determining whether the witness is truthful", and that the statement should be held inadmissible for that reason as well.

Admissibility here largely turns in the last analysis on whether Townley had a motive to lie when he made his Quantico statement to the Chilean officials. We do not believe he did. He was in the United States and no longer under Chilean control. The Chilean *officials* then released him from his oath of silence, and told him he could tell the truth. Under such circumstances he had no motive to lie *to them* –and his statement was given only to them.[45] He was not bargaining with them.

\* \* \* \* \* \*

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross–examination concerning the statement, and the statement is ... (3) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive ...."

**43.** We reject the government's contention that Townley's Quantico statement to the Chilean officials was merely an amendment to his earlier statement to General Orozco in Chile in March. The doctrine of completeness applies to documents that have been partially admitted into evidence, *U. S. v. Greene*, 497 F.2d 1068, 1082 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), and in our view does not apply to two statements made several weeks apart that recite diametrically opposite statements of "fact".

**44.** Fed.R.Ev. 801(d)(1)(B) provides:
"(d) *Statements which are not hearsay.* A statement is not hearsay if–

**45.** Townley testified that his refusal to admit any knowledge of or responsibility for the assassination when he was in Chile was because of his oath of silence to DINA. He testified that he cooperated with U.S. authorities only

He had committed no crime in Chile. His interview was *not* a public statement, was not given to the United States, *preceded* his plea agreement discussion with the federal prosecutors, and according to Townley was not to be released. We accordingly hold that Townley had no motive to lie at that time and that determines the issue of admissibility.[46] Later in the day following discussion with the United States authorities he entered into his plea agreement.[47]

Nevertheless, appellants argue that Townley had a motive to implicate others in order to gain benefits for himself. This argument overlooks the nature and extent of Townley's admissions of his own personal culpability and involvement and the fact that the statement was given to the Chilean authorities under the circumstances cited above. Townley admitted to being the principal active organizer of the assassination in the United States and to actually affixing the bomb to the underframe of the automobile from which it was exploded. If he was of a mind to gain some benefit by giving a false statement his own personal involvement would have been the most logical to reduce. Instead he admitted that he was the principal instigator and perpetrator of the crime in the United States and his disclosure of the lesser role played by others at his request is implicitly corroborative of truth not falsity. It is highly unlikely that Townley would jeopardize an agreement under which he would face a maximum prison term of 10 years–a minimal sentence for his crimes. An absolute condition of the agreement was that Townley be truthful.[48] If he testified falsely he could be prosecuted for perjury and on all the other counts of

the indictment, and the prison term to which he was sentenced assured that he would be readily available for a number of years to become the subject of such prosecutions if he testified falsely in any respect. Accordingly, commonsense would ascribe to Townley a very strong motive to tell the truth, rather than a motive to lie.

At first blush it might appear that one who accepts a plea bargain, on the condition of testifying in the prosecution of others, would have a motive to invent a case against the others. But the bargain here was not struck until after Townley's statement to the Chileans, and the terms of the plea agreement with Townley were so favorable to him, even after he admitted being the principal perpetrator and organizer of the assassination, that it provided substantial inducement *to tell the truth* to guarantee that he would not be sentenced to a far greater punishment. This is the reverse of the more usual situation where a lesser participant in a crime attempts to buy his way out of a very substantial sentence by exposing the major criminals. Here Townley's statement generally incriminated those with lesser actual involvement.

On the other hand, Townley did have a motive to lie to Orozco when he made his statement to him in March in Chile, hoping as he must have at that time to exculpate himself and the Chilean government, and make it appear to those persons in Chile who were knowledgeable about the crime that he was complying with his oath of silence. (Tr. 2057). At that time he was in Chile and under the complete control of the Chilean government. Had he told the truth

after Orozco expressed the Chileans' desire that he do so.

46. There is no requirement that the prior consistent statement have been made before the prior inconsistent statement. *Copes v. United States*, 345 F.2d 723, 726 (D.C.Cir.1964).

47. The fact that his oral statement was not reduced to writing until the next day, after he had entered into his plea agreement, does not alter the fact that his statement to the Chileans predated the plea agreement.

48. On redirect examination by Mr. Propper:

Propper: What is your understanding and what can you be prosecuted for, Mr. Townley, as it says in that agreement, with respect to what is said in the agreement?
Townley: For giving untruthful testimony here at this trial and any subsequent trials held in the United States for matters of which I have knowledge.
Propper: And what can you be prosecuted for?
Townley: To the full extent of all of the counts of the indictment and for perjury. (Tr. 2761–62)

at that time and implicated the government in the bombing, or indicated that he was going to do so, he had reason to suspect that his own life would be in jeopardy and he might not have been permitted to depart.

Appellants attempt to draw a parallel between this case and those in which courts have held inadmissible statements made after a motive arose to fabricate. In *Felice v. Long Island Railroad Company*, 426 F.2d 192 (2nd Cir. 1970), *cert. denied*, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), the court ruled inadmissible a statement made by a plaintiff concerning the cause of his accident. Plaintiff made the statement six weeks after he had instituted suit against his employer under the FELA to recover damages flowing from the accident. Discussing the case two years later, another Second Circuit panel explained the case's rationale:

> [T]he fact that [the statements] were made after he began to contemplate the institution of suit provided a strong basis for the inference that a motive to fabricate had developed and that he was trying to make a self–serving record for use at trial.

*Applebaum v. American Export Isbrandt-sen Lines, supra*, 472 F.2d 56, 62 (2nd Cir. 1972). *See also United States v. Greene*, 497 F.2d 1068, 1082 (7th Cir. 1974).

None of the cases cited by appellants, however, involved a witness whose testimony was the result of a plea agreement. More common is the situation in which the witness had a direct pecuniary interest in the outcome of the trial, and hence his prior consistent statement made after the institution of suit was tainted by the existence of a likely motive to lie.[49]

The appellants, in their introduction of the prior *inconsistent* statement that Townley made in Chile, attempted to impeach Townley's version of facts at trial and thus within the terms of Rule 801(d)(1)(B) made

a "charge against him of recent fabrication or improper influence or motive". Under the Rule the government was therefore clearly entitled to introduce Townley's statement that was consistent with his trial testimony to rebut the charge of fabrication, improper influence and motive. The prior consistent statement was "of clear help to the factfinder in determining whether the witness [was] truthful." *Coltrane, supra*. As Judge Medina said in *United States v. Grunewald*, 233 F.2d 556, 566 (2d Cir. 1956), rev. on other grounds, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957):

> The argument is made that [his prior consistent statement] ... was no more than an attempt by Davis to make some sort of a bargain with the government in 1952 and that his motive to falsify was no less operative at that time than on the trial. But this is mere contention, appropriate enough in summation to a jury, but insufficient to form a basis for the rejection of the testimony as matter of law. Otherwise, it would never be proper to rehabilitate a witness by proof of prior consistent statements in cases where numerous impeaching circumstances were shown to exist at the time of the trial but where there may be found a theoretical possibility that the witness might have been motivated by one of them at the time of making the prior consistent statement. It is well established law in this circuit that in such cases the prior consistent statements may be received. *Di Carlo v. United States*, 2 Cir., 6 F.2d 364; *Gelbin v. New York, N.H. & H.R. Co.*, 2 Cir., 62 F.2d 500.

> \*　　\*　　\*　　\*　　\*　　\*

> [And even when a motive is disclosed the] principle involved is that where the circumstances are such as to leave it reasonably possible for the jury to say that the prior consistent statements did in fact antedate the motive disclosed on the

49. Townley's agreement with the prosecutors was not contingent upon conviction of appellants, nor does the record indicate that either Townley or the government intended to "get"

appellants. This case does not involve, therefore, a situation where the government or another party has offered an incentive to a witness to fabricate a story to convict another.

cross–examination, the court should not exclude them.

The circumstances of the agreement, the penalties that would fall on Townley if he gave untruthful testimony, and the magnitude of Townley's admission that he was the principal person in the United States who actively organized the assassination, also present sufficient reasons for concluding that Townley had no motive to lie to the Chileans at the time he made the statement. We therefore hold that Townley's prior consistent statement was properly admitted under Rule 801(d)(1)(B) in accordance with the wide discretion that the Rule and decisions vest in the trial court. *United States v. Zito, supra; Felice v. Long Island Railroad Company, supra; United States v. Mitchell,* 385 F.Supp. 161 (D.D.C.1974).

## XI

### THE DOCTRINE OF TRANSFERRED INTENT AND THE REQUIREMENT OF PREMEDITATION IN THE MURDER OF RONNI MOFFITT

■ Alvin Ross and Guillermo Novo contend that their conviction for the first–degree murder of Ronni Moffitt must be reversed for lack of evidence that they intended to kill her. We reject this argument because of the doctrine of transferred intent. Under this doctrine one who intends to kill one person and kills a bystander instead is deemed to have committed whatever form of homicide would have been committed had he killed the intended victim. 2 Wharton, Criminal Law § 144 at 197 (14th Ed. 1979). There are even stronger grounds for applying the principle where the intended victim is killed by the same act that kills the unintended victim.

■ The English courts recognized the doctrine as early as 1576 in *Reg. v. Saunders,* 2 Plowd. 473, 474a, 75 Eng.Rep. 706, 708 (1576):

And therefore it is every man's business to foresee what wrong or mischief may happen from that which he does with an ill–intention, and it shall be no excuse for

him to say that he intended to kill another, and not the person killed. (c) For if a man of malice prepense shoots an arrow at another with an intent to kill him, and a person to whom he bore no malice is killed by it, this shall be murder in him, for when he shot the arrow he intended to kill, and inasmuch as he directed his instrument of death at one, and thereby has killed another, it shall be the same offence in him as if he had killed the person he aimed at, . . . so the end of the act, *viz.* the killing of another shall be in the same degree, and therefore it shall be murder, and not homicide only.

Authorities cited to the same effect are: *Rex v. Plummer,* 1 Kelyng 109, 84 Eng. Rep. 1103, 1104–110, 88 Eng.Rep. 1565 (1709); Hale, 1 Pleas of the Crown 466 (1736); 4 Blackstone, Commentaries 201 (Cooley Ed. 1884).

The doctrine became part of the common law of Maryland in 1776. *Gladden v. State,* 273 Md. 383, 390, 330 A.2d 176, 180 (1974); *cf. McGraw v. State,* 234 Md. 273, 275–276, 199 A.2d 229, 230–231, *cert. denied,* 379 U.S. 862, 85 S.Ct. 124, 13 L.Ed.2d 64 (1964). The District of Columbia was established by the Act of July 16, 1790, which provided: "that the operation of laws of the state within such district shall not be affected by this acceptance [of the territory from Maryland and Virginia comprising the District of Columbia] until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide." (1 Stat. 130). Thereafter, by the Act of February 27, 1801 Congress enacted "that the laws of the state of Maryland, as they now exist, shall be and continue in force in that part of the said district [of Columbia], which was ceded by that state to the United States . . ." (2 Stat. 104–5).[50]

These statutes brought the Common Law and British statutes into force in the District of Columbia in 1801 and the current statute continues that legal situation. The laws in force in the District of Columbia are currently prescribed by the District of Columbia Code as follows:

---

**50.** See also District of Columbia Code, "Historical", page XVII (1973 Ed.).

§ 49–301. Common law, principles of equity and admiralty, and Acts of Congress to remain in force.

The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general Acts of Congress not locally inapplicable in the District of Columbia, and all Acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except in so far as the same are inconsistent with, or are replaced by, [some provision of the 1901 Code.]

D.C.Code § 49–301; Act of March 3, 1901, 31 Stat. 1189, c. 854 § 1.

In *Bishop v. United States*, 71 App.D.C. 132, 134–35, 107 F.2d 297, 301 (1939), the opinion by later Chief Justice Vinson deals specifically with the crime of murder and states:

Under the District of Columbia statute, a homicide committed purposely and with deliberate and premeditated malice is murder in the first degree. A homicide committed with malice aforethought, without deliberation and premeditation, is murder in the second degree. "Malice aforethought" may be shown expressly, or may be "implied" from the commission of the act itself. *Although distinction is made in the severity of punishment for the degrees of murder, the statute embodies the substance of murder as it was known to the common law.* See *Hill v. United States*, 22 App.D.C. 395; *Hamilton v. United States*, 26 App.D.C. 382; *Burge v. United States*, 26 App.D.C. 524.

(Footnotes omitted) (Emphasis added).

A fine opinion written last year by Associate Judge Kern of the District of Columbia Court of Appeals also confirms that the doctrine of transferred intent is to be applied in the District of Columbia in first degree murder cases. *O'Connor v. United States*, 399 A.2d 21 (D.C.1979). The earlier exhaustive opinion by Judge O'Donnell of the Court of Appeals of Maryland in *Gladden v. Maryland, supra*, is also a very significant contribution to the law in this area. It concludes:

that the doctrine of "transferred intent" is the law of Maryland and that the *mens rea* of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim.

330 A.2d at 189. The reasoning of that opinion is so sound and the authorities cited are so exhaustive that nothing remains to be done. We concur in its reasoning and its result.

■ The evidence at trial established that Guillermo and Ross were members of the conspiracy, the object of which was the deliberate and premeditated murder of Letelier, which was charged as an overt act in the conspiracy. This object was accomplished in the manner the conspirators had agreed upon. The guilt of Guillermo and Ross on the substantive murder counts may rest upon their participation in the completed conspiracy or under 18 U.S.C. § 2 and D.C.Code § 22–105 which declare they are punishable as principals for the murders because they aided and abetted and counselled or advised the commission of the offense. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). With respect to the conspiracy theory Justice Douglas remarked:

when the substantive offense is committed by one of the conspirators in furtherance of the unlawful project ... [t]he criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy under § 37 of the Criminal Code, 18 U.S.C. § 88. If

that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense.

328 U.S. at 647, 66 S.Ct. at 1184.

*Pinkerton* thus holds that a conspirator can be found guilty of a substantive offense based upon acts of his coconspirator so long as the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement. *United States v. Moreno*, 588 F.2d 490, 493 (5th Cir. 1979), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979), is to the same effect. Once the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his coconspirators. *United States v. Michel*, 588 F.2d 986, 999 (5th Cir. 1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). State courts follow the same principle:

> If one procures or conspires with another to commit a crime, he is guilty of everything done by his confederates which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original plan.

*State v. Hurst*, 153 Minn. 525, 193 N.W. 680 (1922). Hence, even if the murder of Ronni Moffitt was not expressly contemplated by appellants, she was killed in the assassination of Letelier, which was the object of the conspiracy, and her death was a foreseeable consequence of the assassination plan to detonate the bomb. Appellants are thus liable under the conspiracy theory for the substantive offense of the first degree murder of Ronni Moffitt.

Appellants are also liable for the murder of Ronni Moffitt under an aiding and abetting theory.[51] Liability under this theory parallels that under the conspiracy theory:

> The common law concepts of causation and vicarious responsibility are operative [in applying the District of Columbia's felony–murder statute]. The accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts of the other person which are in furtherance of the common design or plan to commit the felony, or are the natural and probable consequences of acts done in the perpetration of the felony.

*United States v. Heinlein*, 490 F.2d 725, 735 (D.C.Cir.1973). A culpable aider and abetter need not perform the substantive offense, *United States v. Staten*, 581 F.2d 878, 886 (D.C.Cir.1978), need not know its details, *United States v. Sanborn*, 563 F.2d 488, 491 (1st Cir. 1977), and need not even be present, *United States v. Molina*, 581 F.2d 56, 61 (2d Cir. 1978) so long as the offense committed by the principal was in furtherance of the common design.

Much of the evidence of the appellant's participation in the conspiracy also served to prove that they aided, abetted and *advised* the commission of the crime that was the object of the conspiracy. The doctrine of transferred intent also comes into play so that Guillermo and Ross, who aided and abetted the murder of Letelier, are, with the principals who affixed and detonated the bomb, equally responsible for the criminal intent with which Ronni Moffitt was killed.

---

**51.** D.C.Code § 22–105 provides:

> In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, ....

The federal aiding and abetting statute, 18 U.S.C. § 2, would apply in similar fashion to count six. This count charged Guillermo Novo, Ross and others with destruction of Letelier's car, then being used in interstate commerce, by bomb, causing the death of Letelier and Moffitt, in violation of 18 U.S.C. § 844(i).

The jury was fully and properly charged on the criminal responsibility that flows from aiding and abetting an offense. (Tr. 5559–61).

Although Guillermo and Ross may have been in New Jersey at the time of detonation, they cannot hide their responsibility for the death of Ronni Moffitt in the claim that she only became an unintended victim of the conspiracy as its original objective to assassinate Letelier reached the point of execution. Strong circumstantial evidence indicates that the co–conspirator who detonated the bomb must have known that the Moffitts were in the car with Letelier. According to the trial testimony of Michael Moffitt, since the Moffitts' car was inoperative on September 20th the Moffitts drove with Letelier in his car to the Letelier's home for dinner the night before the assassination. The co–conspirator Townley had already affixed the bomb to the underframe of Letelier's car during the night of September 18–19. (Tr. 1683–86). At the end of the evening of September 20th Letelier loaned his car to the Moffitts to drive to their home, and they promised to return to pick him up on the way to work the next morning. This they did on September 21st and the three of them got into Letelier's car, with Michael Moffitt in the back, Ronni in the passenger seat, and Letelier driving. This was their seating arrangement in Letelier's car, on their way to work when the bomb was exploded at Sheridan Circle. (Tr. 1202–1208).

The conspirators apparently went to considerable lengths to be certain that Letelier was in the car. The bomb was not detonated while the Moffitts had the car in their possession. Its detonation was actually delayed for three days from the time the bomb was in place. And it was impossible on the day in question to know that Letelier was driving the car and not know that he had passengers because the Moffitts were in the car at all relevant periods on that date. Any surveillance of Letelier's home or his car on the day in question would have revealed that he was driving with his two associates. The circumstantial evidence of such surveillance is very strong. In addition it is a fair inference from the testimony that the co–conspirator who caused the

bomb to detonate at Sheridan Circle was close by and could not have failed to see that the car had other occupants. Tests of the detonating system described by Townley indicated that the person detonating the bomb could have been no farther than 1,000 feet from the car at the time of the explosion. (Tr. 3866). In addition, Townley testified that he had instructed his co–conspirators to explode the bomb near a small park so as not to injure innocent bystanders. (Tr. 1686–87). The person who detonated the bomb would thus have to be close by to assure that the bomb was detonated when the moving car was at Sheridan Circle. This makes it extremely probable that the conspirator who detonated the bomb actually saw that the car contained three passengers rather than one.

Thus, the circumstances leading up to the detonation, the evidence of the participation of Guillermo and Ross as members of the conspiracy, their responsibility as principals in the murder of Letelier which flows from aiding and abetting that crime, and the doctrine of transferred intent, all support the conclusion that Guillermo and Ross, on the evidence at trial, were guilty as principals of the murder of both Letelier and Moffitt.

While we vacate the convictions of Ross and Guillermo Novo for the reasons elaborated elsewhere in this opinion, we have felt it prudent to discuss other issues, such as this one, that may recur on the retrial.

## XII

## THE COMPARATIVE SEVERITY OF THE SENTENCES OF TOWNLEY, GUILLERMO AND ROSS

Guillermo and Ross contend that their sentences are cruel and unusual in violation of the Eighth Amendment and are also a denial of their rights under the Fourteenth Amendment to equal protection of the laws. Having been found guilty on the murder counts and of conspiracy they were each sentenced to two life terms, to run consecu-

tively.[52] Their complaint is based on the lesser sentence received by Townley who had a greater part in the crime. Their brief states their claim as follows:

> Michael Vernon Townley masterminded the Letelier assassination, brought his criminal plans to the United States, enlisted others to assist him, went to Washington, built the bomb and planted it in Letelier's car. Even crediting all of the Government's allegations, appellants on the other hand, played a very minor role in these events. Appellant Novo is accused of providing some of the explosives and appellant Ross is accused merely with having been present at certain peripheral events. Neither appellant went to Washington, neither appellant built the bomb, neither appellant planted that bomb, and neither appellant detonated it. Nevertheless, Townley was sentenced to only ten years incarceration; he will be eligible for parole after serving 3⅓ years.
>
> Application of these principles to the present case establishes that the sentence imposed upon appellants was improper. Appellants were indisputably less culpable than Townley. Even his belated cooperation, prompted purely by self-interest after he had been extradited to this country to face trial, does not justify this gross disparity. Appellants are constitutionally entitled to a sentence which is not greater than the man's who actually committed this crime has received.

Appellants Br. Vol. II, pp. 191, 193. While the foregoing statement understates appellants' involvement it accurately describes Townley's participation in the crime and his sentence but in attacking it fails to give adequate recognition to the fact that Townley entered a guilty plea and testified for the Government with respect to the entire crime.

 It is a sufficient answer to these claims that a sentencing court is entitled to take a defendant's guilty plea and cooperation with the Government into consideration in imposing sentence. *Roberts v. Unit-*

ed States, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), authored by Mr. Justice Powell, held that consideration by the court of a defendant's failure to cooperate with the Government was a proper factor for a court to consider in sentencing.

> [G]ross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.
>
> *This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself.* Unless his silence is protected by the privilege against self-incrimination, see Part III, *infra*, the criminal defendant no less than any other citizen is obliged to assist the authorities. The petitioner, for example, was asked to expose the purveyors of heroin in his own community in exchange for a favorable disposition of his case. By declining to cooperate, petitioner rejected an "obligatio[n] of community life" that should be recognized before rehabilitation can begin. See Hart, The Aims of the Criminal Law, 23 Law & Contemp.Prob. 401, 437 (1958). Moreover, petitioner's refusal to cooperate protected his former partners in crime, thereby preserving his ability to resume criminal activities upon release. Few facts available to a sentencing judge are more relevant to " 'the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he does or does not deem himself at war with his society.' " *United States v. Grayson, supra*, 438 U.S. 41, at 51, 98 S.Ct. 2610, at 2616, quoting *United States v. Hendrix*, 505 F.2d 1233, 1236 (CA2 1974).

445 U.S. 558, 100 S.Ct. 1363. (Emphasis added). The law is thus clear that the extent to which a guilty defendant complies with the obligation of all citizens to assist in a criminal investigation is relevant in the determination of an appropriate sentence. The sentences imposed here on Guillermo and Ross were within the statutory limits

---

**52.** Guillermo also was adjudged five year sentences on each of his false declarations counts

to run concurrently with each other and concurrently with his life sentences.

and their severity alone would be no justification for an appellate court to interfere. *Gore v. United States*, 357 U.S. 386, 393, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958); *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *Blockberger v. United States*, 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Moore*, 183 U.S.App.D.C. 461, 464, 564 F.2d 482, 485 (1977). Gov't. Br. p. 168.

It is true that there is a great disparity in the involvement and in the sentences of Townley, Guillermo and Ross. The sentences are in inverse proportion to the proven and admitted involvement of the three named defendants. But there was also a tremendous disparity between the contributions to eventual justice by the respective defendants. Townley, in waiving his constitutional privilege against self–incrimination, testifying for the government and disclosing the identity and activities of all the conspirators, made a tremendous contribution to eventual justice, which, despite the benefits he received from the plea agreement, was not without its own courageous features. The risk to his life continues from those he has exposed, and who continue at large, and this risk will exist as long as he lives and is able to testify. For those who participated in the crime, their relatives and colleagues, his conduct in testifying for the government in this case has the potential for making him a marked man for his entire life. The sentencing court was justified in taking such facts into consideration in imposing sentence. It was also justified in awarding a lesser sentence to Townley at the request of the Government as recompense for his disclosure of the facts behind one of the most monstrous international crimes in recent history.

We express no opinion on the *wisdom* of any of the sentences–merely on their legality.

## XIII

### MISCELLANEOUS CONTENTIONS

The defendants make several other complaints, none of them valid. We discuss them briefly because the questions they present may recur when the case is tried again.

### A. TESTIMONY CONCERNING LETELIER'S ACTIVITIES

The defendants say it was error to admit the testimony of Senator George McGovern, Mrs. Letelier and Ralus ter Beek, a Dutch businessman, about Letelier's activities in opposition to the government of Chile. We think however that this evidence was admissible as tending to show a motive for the assassination of Letelier. The decree revoking Letelier's citizenship in June 1976, was evidence that his activities were known to the Chilean government.

### B. EVIDENCE CONCERNING THE EXPLOSION AND THE AUTOPSIES

At trial the government introduced the testimony of four eyewitnesses to the explosion which killed Letelier and Moffitt, and the testimony of two medical examiners who performed autopsies on their bodies. The defendants objected to this testimony, and offered to stipulate that the deaths had been caused by the explosion of a bomb. According to the defendants the purpose of the government's evidence was "just to inflame this jury". (TR. 1273). We hold that the evidence was admissible.

To sustain the charge of murder in the first degree against Guillermo Novo and Alvin Ross the government was required to prove that the killer or killers of Letelier and Moffitt acted with deliberation and premeditation. Proof of the precise nature of the explosion and its results was relevant to this issue. Although gruesome, this evidence demonstrated that whoever fashioned and placed the bomb in Letelier's automobile had the deliberate and premeditated intent to kill him; such a powerful bomb could have no other purpose. The government was entitled to present this evidence to the jury notwithstanding the defendants' offer to stipulate the cause of death, for a stipulation would have substantially diluted the force of the proof. *See United States v.*

*Peltier,* 585 F.2d 314 (8th Cir. 1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States v. Cockerham,* 155 U.S.App.D.C. 97, 476 F.2d 542 (1973); *Hemphill v. United States,* 131 U.S. App.D.C. 46, 402 F.2d 187 (1968).

We note that after considering the government's proffer of evidence concerning the explosion and its results the District Court wisely limited the number of witnesses and the type of proof that would be admitted. Thus the court questioned why the government needed two civilian witnesses. When the government explained that one witness had been driving in Sheridan Circle, and the other walking, the court excluded the walker and severely restricted the testimony of the driver. The government proffered two police witnesses but only one was allowed to testify. Four out of ten photographs showing the scene of the crime were excluded, as well as photographs of the victims. Testimony concerning the autopsies was restricted. This prudent exercise of the court's discretion gave the government what it was entitled to have, but no more. The defendants had no ground for complaint.

## C. THE ARMS LIST AND THE BRIGADE MANUAL

█ The defendants say it was error to receive in evidence a list of arms and a "Brigade Manual" found in an apartment which had been occupied by Ross. According to the defendants they were prejudiced because guns were listed among the weapons described in this document, although there was no evidence that the defendants had used guns. The result, say the defendants, was to suggest that they were bad men capable of committing the crime charged. Furthermore, they argue that the Brigade Manual contained "revolutionary rhetoric" which damaged them.

Contrary to the defendants' assertion the arms list mentioned not only guns, but also explosives, fuses, detonating cords and electrical connections. (*See* Government's Exhibits Nos. 92–92d). Opposite each item of equipment were initials under the heading of "Charged to" or "In possession of". The initials "A.R.", "V.P." and "G" frequently appeared. It was a fair inference that these initials referred to Alvin Ross, Virgilio Paz and Guillermo Novo. It was also a fair inference from the list that the defendants possessed or had access to explosives and detonators which they could supply to Townley. Moreover, the appearance of the initials of Ross and Guillermo Novo was evidence tending to prove their association as co–conspirators.

The objection to the Brigade Manual is untenable for two reasons. First, the government offered only the pages which provided instruction on the use and capabilities of several components of the Letelier bomb, including TNT, C–4 plastic explosives and electrical detonating caps. No revolutionary rhetoric appeared on those pages, which were plainly relevant and admissible. When the court ruled that it would admit those pages offered by the government the defendants offered "the entire Brigade Manual, then, Judge, because–because if you only go for those pages, it will look like it was taken out of context." (TR. 5110) The entire manual was then received. In the second place, the record discloses that the Brigade Manual was never seen by the jury, so that the jury could not have been influenced by any "revolutionary rhetoric" which it contained.

## D. THE MOTION FOR CHANGE OF VENUE

█ The defendants contend that the publicity generated by this case was so prejudicial that their motion for a change of venue should have been granted, that their right to a fair trial by an impartial jury was denied when the case was tried in the District of Columbia. We do not agree.

The defendants suggest that there was continuous inflammatory publicity about their case, over a long period of time. On the contrary the record discloses that the publicity concerning the matter was confined to three widely separated periods: September 1976, when the murders occurred; spring and summer 1978 when

Townley began to cooperate with the government and the defendants were indicted; and the week before trial in January 1979. None of the newspaper articles cited by the defendants is dated after August 1978, five months before trial. This coverage of the case was far less than the intense barrage of damaging publicity, over a long period, found in *United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31 (1976), *en banc, cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). A motion for change of venue was denied in that case, and this court affirmed the conviction.

On voir dire the District Court took great care to select a fair and impartial jury untainted by pretrial publicity. Jury selection took four days and occupied more than 800 pages of the trial transcript. The District Court warned the prospective jurors that news reports contained inaccuracies and several times ordered them not to read, look at or listen to any reports of the proceedings. Under questioning, it appeared that 88 of the 166 prospective jurors had read or heard something about the case. Of these 88, 32 had no recollection of the contents of the news reports. The court individually questioned each of the remaining 56 who had some recollection of what they had heard or read. The questioning conformed to the procedure specifically approved by this court in *United States v. Caldwell*, 178 U.S.App.D.C. 20, 32, 543 F.2d 1333, 1345 (1974), *cert. denied* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), and *United States v. Bryant*, 153 U.S.App.D.C. 72, 471 F.2d 1040, *cert. denied*, 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973).

Of the twelve jurors who rendered the verdict, four had not heard of the case, four had heard of it but had no specific recollection of the facts and no opinion or impression about the guilt or innocence of the defendants. The remaining four had some recollection of what they had read or heard, and two had heard about a threat to the judge. Of these two, one indicated that he put little faith in news reports because "reporters have a tendency to write what they want." The other one, although concerned about the judge's safety, had not formed any opinion for or against the defendants and felt no fear so far as they were concerned. None of the jury panel had formed any opinion whatsoever about the guilt or innocence of the defendants or knew of any reason why he or she could not render a fair and impartial verdict. Finally, any further danger of prejudice was eliminated when the jury was sequestered.

The defendants' assertion of prejudice must be rejected.

## E. DISCOVERY

The defendants say they were denied discovery of materials to which they were entitled under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the *Jencks Act*, 18 U.S.C. § 3500, and Rule 16(a) Fed.R.Crim.P. In particular they complain that they were denied access to (1) CIA files on Michael Townley, (2) CIA files showing an affiliation between the CIA and Audio Intelligence Development, Inc., (3) materials showing that Townley "had made certain changes in his story since his pretrial statements to investigators", (4) a prior statement made by the witness Ricardo Canete, and (5) grand jury minutes of a potential defense witness. We hold that there was no error.

At trial the defendants contended that when Townley murdered Letelier he was acting as an agent of the CIA. Pursuant to that theory the defense requested the production of the CIA file on Townley. The government produced the file and it was examined by the district judge *in camera*. The government also submitted affidavits from two CIA officials, Marvin L. Smith and Robert W. Gambino, who were competent to testify concerning the contents of the file.

According to the affidavits of Mr. Smith and Mr. Gambino the CIA file reflects that in November 1970 Townley offered his services to the Agency, that a "name check" on him was conducted in that month, and that in September 1971 the CIA Directorate of Operations requested "preliminary security

approval to use Mr. Townley in an operational capacity." Subsequent attempts to get in touch with Townley were unsuccessful, however, and the file reflects that as of December 21, 1971 the Agency was no longer interested in the man. According to the affidavits the CIA file further discloses that in June 1973 Townley again approached the Agency and offered to answer questions if the Agency "desired to debrief him." He was told that the Agency had no questions for him, but would be pleased to accept any information he wanted to pass. He did not give any information and the Agency had no further contact with him. The affidavits were received as defense exhibits at trial, and Mr. Gambino and Mr. Smith testified as witnesses called by the defendants.

In conformity with the procedure approved in *Xydas v. United States*, 144 U.S. App.D.C. 184, 445 F.2d 660 (1970), the district judge reviewed the CIA file *in camera*. He concluded that it contained nothing exculpatory, that there were no discrepancies between the affidavits and the contents of the file and that it was not material to the preparation of the defense. Having carefully reviewed the file ourselves we agree with the district judge. There is nothing in the file that would help the defendants. Specifically, it contains no signed or verbatim statement from Townley, and there is no material that would give even the most imaginative advocate a basis for contending that Townley was ever an agent of the CIA. The District Court's ruling was correct.

The defendants demanded the production of all material in CIA files concerning any relationship between the Agency and Audio Intelligence Development, Inc., a company in Miami, and its President, one John Holcomb. It appeared that on September 21, 1976, the day of Letelier's murder, Townley, using an alias, had visited the office of this company. Counsel for the defendants represented that information derived from a newspaper story and from Cubans in Florida indicated to him that Audio Intelligence Development, Inc., was "a CIA front". The district judge denied the request for production upon the ground that the defendants had sufficient information to conduct their own investigation of the matter and should "exhaust" the leads in their possession. (TR., Dec. 13, 1978, p. 95)

It does not appear that the defendants ever made any investigation in an attempt to confirm the information they had about Audio Intelligence and Holcomb. Furthermore, the government represents to us in its brief (p. 145) that "CIA was unable to provide any files showing an affiliative relationship with Holcomb or AID for the simple reason that no such files existed. AID has never been a 'front,' proprietary, or any other type of suborganization owing allegience [sic] to the CIA; thus the Government had no material which it could have turned over under any theory of discovery." (Footnote omitted) In the light of this professional representation, together with the failure of the defendants to pursue their own investigation of Holcomb and AID, and finally in view of our disposition of the case on other grounds, we see no need to prolong this opinion with an extended consideration of the District Court's ruling. In the event of a retrial we assume that the government will confirm counsel's representation by testimony or an affidavit.

The defendants' remaining complaints concerning discovery can be disposed of in a few words.

1. There was no obligation on the part of the government to inform the defendants whenever Townley, in his interviews with government counsel in preparation for trial, amplified or clarified his previous statements, or slightly corrected them after refreshing his memory. There was nothing exculpatory in such changes, and in any event the defendants had been furnished with Townley's pretrial written statements which they of course used for impeachment purposes. In fact we note that the defendants received more than 500 pages of material in response to their requests for discovery.

2. The defendants' request for a prior statement by the witness Canete refers to a statement or statements he was alleged to have made in the course of a polygraph

test. The short answer to this request is that such statements were not recorded.

■ 3. The defendants requested the transcript of the grand jury testimony of one of their prospective witnesses. It appears that counsel for the defendants, as an ethical member of the bar, feared that the testimony the witness proposed to give might not be true and counsel quite properly was unwilling to sponsor perjury. (He did not call the witness.) However we know of no federal case holding that a trial court abused its discretion by refusing to disclose to a criminal defendant the grand jury testimony of his own potential witness. We will not create such a precedent in this case. *See Xydas v. United States, supra.*

## F. THE TOWNLEY TOURS

■ At trial the government introduced the testimony of FBI agents who had taken Michael Townley on tours to places and buildings he had mentioned in his statements to the FBI. The agents testified that without prompting from them Townley had directed them to the locations or buildings mentioned and had pointed them out. The defendants now say the admission of this testimony was error because it was hearsay.

The short and complete answer to the defendants' present contention is that when the testimony concerning the tours was offered the defendants affirmatively stated that they had no objection to it. Defense counsel told the District Court: "Judge, we don't have any objection to the portion of his [the agent's] testimony which takes him through Washington, D.C., in the presence of Townley, pointing out locations, ..." (TR. 2830) The defendants made no other comment on the agents' testimony, except to object to the admission of any oral statements made by Townley during the tours. *See, e. g.,* TR. 2835, 2962–63, 3601. These objections were sustained. Accordingly, we think the defendants are not in a position to

complain that the admission of the agents' testimony was error.

In any event, the testimony concerning the tours was not admitted to prove that certain events actually took place at the locations visited, but rather to establish that the places and buildings visited were where and what Townley had said they were. In other words, the tours were a test of Townley's accuracy and veracity. The testimony was therefore analogous to evidence of a prior identification by a witness, admissible to corroborate the identification made by the witness in court. Rule 801(d)(1)(C) Fed.R.Evid.[53]

We conclude that there was no error on this point.

## G. ABANDONMENT OF THE MATERIAL FOUND AT 4523 BERGENLINE AVENUE

■ Appellant Ross argues that evidence of bombing materials that was found in an office rented by Ross and a business partner, Carlos Garcia, should have been suppressed at trial because the government did not secure a search warrant prior to seizure of the evidence. However, a search warrant is not required where a person has "so relinquished his interest in the property that he no longer has a reasonable expectation of privacy in it at the time of the search." *United States v. Jackson, supra,* 544 F.2d 407, 409 (9th Cir. 1976). In this instance the objective circumstances provide an inescapable inference that the premises and the materials within the office were intentionally abandoned. "Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts." *Id.* at 409.

■ There are at least four factors that indicate the government was justified in assuming that Ross and Garcia had abandoned the contents of the office. Ross and Garcia as proprietors of C and P Novelty

---

**53.** The situation here is distinguishable from that in *United States v. Caro,* 569 F.2d 411, 416, n.9 (5th Cir. 1978) in which "assertive conduct" of a co–conspirator, after the termination of a conspiracy, was held to be subject to the hearsay rule. The co–conspirator was not, as was Townley, a government witness.

failed to pay their rent for four months, and to the knowledge of Vega, the building supervisor, they never returned to the office during that period. They never claimed the property he testified they had left there. This is a telling indication of abandonment since Garcia had been explicitly informed that Vega would clean out the office if the rent were not paid immediately, in November. Neither Garcia nor Ross interfered with Vega's use of the office for his own purposes, an action which amounted to the landlord's reclamation of his possessory interest in the office premises.

And on March 6, Vega found the bombing materials, called the FBI and turned over to Sikoral, the FBI agent, eight electric matches and a receipt for the paging system that had been used to detonate the Letelier bomb. He declined a receipt for the items and stated that he had been intending to throw everything away. (Tr. 777).

These circumstances indicate that Ross and Garcia intentionally abandoned the materials left in the office at 4523 Bergenline. We conclude, therefore, that Ross and Garcia had forfeited any privacy interests in the bombing materials, the FBI was justified in accepting the materials from Vega without a search warrant, that a proper foundation was laid for the admission of the evidence, and that the evidence so received was properly admitted into evidence.

## XIV

### CONCLUSION

For the foregoing reasons the judgments of the District Court with respect to Guillermo Novo Sampol, Alvin Ross and Ignacio Novo Sampol are reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Judgment accordingly.*